## In re ADOPTION OF BABY BOY DOE.

### No. 20392.

Supreme Court of Utah.

March 5, 1986.

Rehearing Denied April 28, 1986.

Michael Gary Martin, Salt Lake City, for appellant.

Teresa Silcox, Salt Lake City, for respondents-interveners (Oregon).

Leland K. Wimmer, Mark Miner, Salt Lake City, for respondents (Burn).

David S. Dolowitz, Salt Lake City, for amicus curiae American Civil Lib.

DURHAM, Justice:

Appellant challenges the decision of the lower court which terminated his parental rights to Baby Boy Doe, appellant's illegitimate son. For the reasons stated below, we reverse.

Appellant, a California resident, lived with Baby Boy Doe's mother, S.H., for three and a half years in California. In June 1984, S.H. moved to Utah to live with her brother and sister-in-law. At that time, S.H. was pregnant with appellant's child. While she was in Utah, S.H.'s relatives tried to discourage any contact between S.H. and appellant. Appellant, however, continued to speak to S.H. on the phone regularly and in early August 1984, appellant came to Utah to visit S.H. Appellant spent less than a week in Utah, during which time the couple went on a camping trip. On that trip, S.H. told appellant that she and her relatives had discussed putting the child up for adoption. Appellant, however, was opposed to the adoption and told S.H. that he wanted to rear the child. S.H. then told appellant that she would move to Arizona and live with him; according to appellant, the couple planned to marry. Following the camping trip, appellant went to Arizona to look for a place for them to live. During that time, appellant continued to communicate with S.H. by phone. On August 24, having found a job and a place to live in Arizona, appellant spoke with S.H. and told her that he was going back to California to pick up their things and move them to Arizona. He apparently also told S.H. that he would call her again on August 27, after the move.

On August 25, one or more weeks earlier than expected, S.H. gave birth to Baby Boy Doe in Utah. On that date appellant was on the road between California and Arizona. On August 27, S.H. went before a judge, relinquished her parental rights, and consented to the adoption of Baby Boy Doe. On the same day, respondents Burn [1] filed a petition to adopt the child and the

court executed a temporary custody order which placed Baby Boy Doe with respondents Burn. Mrs. Burn works with S.H.'s sister-in-law. Prior to the birth, the sister-in-law had made arrangements with Mrs. Burn to have Mrs. Burn's relatives, respondents-intervenors Oregon,[2] adopt the child and the sister-in-law had been in contact with the Oregons' lawyer regarding the adoption. On August 27, however, the Oregons could not immediately be contacted. After they were contacted, the Oregons came to Utah and took custody of Baby Boy Doe on August 28. Three days later, the Oregons left Utah and took Baby Boy Doe home with them, after having been advised by legal counsel that it was appropriate to do so.

The record indicates that all parties were aware of appellant's opposition to adoption, and that appellant first became aware of the adoption on August 28, having tried unsuccessfully to reach S.H. on August 27 (each time appellant called, S.H.'s relatives answered the phone and told him that she was not available). As soon as he learned of the birth and the adoption, appellant contacted a lawyer, drove to Utah, and picked up S.H. Together they filed a notice of claim to paternity on August 29, in Salt Lake City. Appellant then retained local counsel. On September 6, appellant filed a motion to set aside the termination of his rights to Baby Boy Doe. Appellant later filed an amended motion to vacate the adoption petition.

After an evidentiary hearing at which S.H. did not appear, the judge issued a memorandum decision which denied appellant's motion to vacate the adoption petition. The judge found that the child's natural mother had voluntarily consented to the adoption and that the respondents Burn had filed their petition in good faith, intending to adopt Baby Boy Doe if the intervenors Oregon could not. The judge further found that appellant knew where the natural mother was residing during the last trimester of her pregnancy, that appellant knew or should have known the moth-

er intended to place Baby Boy Doe for adoption, and that she was susceptible to her relatives' influence. Finally, the judge found that it was not impossible for appellant to have filed his claim to paternity prior to the filing of the petition for adoption and that he had reasonable opportunity to do so. On that basis, the judge upheld the adoption petition and the application of U.C.A., 1953, § 78–30–4(3).

In this appeal, appellant challenges the validity of the petition for adoption filed by respondents Burn and the constitutionality of the application of section 78–30–4(3), which terminated appellant's rights to Baby Boy Doe.

Section 78–30–4(3)(b), U.C.A., 1953 (Supp. 1983), terminates the parental rights of the father of an illegitimate child if the father fails to file a notice of paternity prior to the filing of a petition for adoption. In this case, the petition was filed two days prior to the filing of the notice of paternity. As the trial court pointed out, the validity of the adoption petition is the threshold issue because an invalid petition could not serve as a predicate for the termination of parental rights.

■ In challenging the validity of the petition, appellant argues that it was procured fraudulently, since respondents Burn misrepresented that they intended to keep the child and then gave the child up less than twenty-four hours after they were awarded a temporary custody order. The record indicates, however, that the intent and good faith of respondents Burn was extensively explored by the trial court. Following examination by appellant's counsel, the trial judge himself questioned the witnesses as to the circumstances surrounding the filing of the adoption petition. On that basis, the trial court specifically found that respondents Burn had filed the petition in good faith and with the intent to adopt the child. Further, the court determined that the Burns had satisfactorily explained their reasons for giving physical custody of the child to respondents Oregon.

2. Oregon is also a fictitious name. Mr. and Mrs. Oregon are residents of Oregon.

The court therefore concluded that the petition was valid. We believe that this determination was one which was particularly within the province of the fact finder. As the trial court had considerable opportunity to observe the witnesses, listen to their responses, and evaluate their credibility on this issue, we decline to overturn the findings or the conclusion as to validity of the petition. *See Wilson v. Pierce,* 14 Utah 317, 318–19, 383 P.2d 925, 926 (1963).

■ We next consider whether the termination of parental rights by operation of section 78–30–4(3) was appropriate in this case. We have previously considered the operation of this statute on three occasions, *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-day Saints,* Utah, 615 P.2d 1250 (1980); *Wells v. Children's Aid Society of Utah,* Utah, 681 P.2d 199 (1984); *Sanchez v. L.D.S. Social Services,* Utah, 680 P.2d 753 (1984). Those cases have established the facial constitutionality of the statute, but as we said in *Ellis,* "a statute fair upon its face may be shown to be void and unenforceable as applied." 615 P.2d at 1256. If the putative father "is successful in showing that the termination of his parental rights was contrary to basic notions of due process, and that he came forward within a reasonable time after the baby's birth, he should be deemed to have complied with the statute." *Id.* Appellant claims that he made the requisite showing in the court below, but that his rights were terminated nonetheless. In assessing the merit of appellant's claim, it is necessary to review the bases on which we have made our prior rulings and to consider the significant circumstances of the case before us in light of our prior rulings.

In *Ellis,* both parents were California residents. They had planned to marry, but the child's mother had broken the engagement just before the wedding. Both parties were aware that the mother was pregnant at that time. Five months later and several days before the baby was born, without telling the father, the mother came to Utah to have the child. When she got here, the mother made arrangements to relinquish the child for adoption. After the child was born, the mother listed the child's father as "unknown," and four days later, relinquished the child. The father was still in California when he learned of the birth and the pending adoption. The father immediately contacted the agency handling the adoption and filed a notice of paternity with the Utah Bureau of Vital Statistics. He then initiated legal action to gain custody of the child. The trial court dismissed the father's action and on appeal this Court reversed. The Court stated that in a situation where it is impossible for the father to file the required notice prior to the bar imposed by statute, "through no fault of his own[,] ... due process requires that he be permitted to show that he was not afforded a reasonable opportunity to comply with the statute." 615 P.2d at 1256.

The Court further examined this issue in *Wells v. Children's Aid Society of Utah,* Utah, 681 P.2d 199 (1984). In *Wells,* this Court reversed the judgment of the trial court which had concluded that the father was denied a reasonable opportunity to comply with the statute. We stated that the reasonable opportunity standard applies only where it is "first shown that it was 'impossible' for the father to file 'through no fault of his own.'" 681 P.2d at 208. In distinguishing *Ellis* and establishing that it was *not* "impossible" for the father to file, we stated:

> Here the birth occurred in the same state as the father's residence, and neither the child's mother nor the agency was involved in any effort to prevent him from learning of the birth or from asserting his parental rights. Neither the mother nor the agency knew at the time the child was relinquished that the father was seeking to or intending to assert his parental rights. All the father needed to do to assert his rights was file his claim of paternity with the Utah Department any time prior to September 24, the date the mother relinquished the child to the agency. He had sufficient opportunity to do so in this case, including ample

advance notice of the expected time of birth and the fact that the mother intended to relinquish the child for adoption, advice of counsel on filing the required form, and a copy of the form provided by a social worker for the department. These opportunities exceed what is necessary to contradict either one of the two essential elements of the *Ellis* exception: it was (1) "impossible" for the father to make a timely filing of the required notice, and (2) "through no fault of his own."

*Id.* at 207–08. Having established factors which clearly undermine the conclusion of "impossibility" or lack of "reasonable opportunity," this Court went on to decide the more difficult case of *Sanchez v. L.D.S. Social Services,* Utah, 680 P.2d 753 (1984).

*In Sanchez,* the majority of this Court upheld the application of the statute under the following circumstances: both parents were Utah residents; prior to the birth, the mother told the father that she would not live with or marry him and that she was considering adoption; the parents together attended a counseling session at the agency which later took custody of the child for adoption; the father had visited the mother and child in the hospital prior to the time the child was relinquished; and on the day the child was relinquished, the mother called the father and "told him to come to the hospital if he wanted to see the baby one last time. When Sanchez went to the hospital on the 27th, he did not protest the mother's decision to place the child for adoption," although the father did attempt to sign the birth certificate and then filed a notice of paternity after the baby was relinquished. 680 P.2d at 755. In upholding the termination of the father's rights, the majority pointed out that "Sanchez lived in this state throughout the pregnancy, knew of the time and place of the birth of the child, and was presumed to know the law." *Id.* Further, the Court concluded that "there is no constitutional requirement that § 78–30–4 give actual notice of the statutory requirements for establishing paternal rights." *Id.*

In the case before us, the trial court in its memorandum decision determined that the circumstances of this case "are not materially distinguishable from those circumstances set forth in both the *Wells* and the *Sanchez* cases." The court therefore entered the following conclusion of law:

4. Utah Code Ann., § 78–30–4(3) (1983 Supp.) is constitutional as applied to the facts of this case because it was possible for [appellant] to have filed his Notice of Claim and because he had a reasonable opportunity to file Notice before the petition to adopt was filed by petitioners' Burn.

We disagree. The circumstances on which we based the *Wells* and *Sanchez* decisions are not present in this case. Appellant, unlike Wells and Sanchez, was not a Utah resident and during the relevant period had spent less than a week in this state, most of which time was spent on a camping trip. Further, on that trip, the child's mother told appellant that she would move to Arizona with him and the plan was to move prior to the birth of the baby. By making those representations, the child's mother alleviated any concern appellant might otherwise have had as to his need to protect his parental rights because he had no reason to believe an adoption would be attempted. No such representations were made to either Wells or Sanchez. It is also significant that appellant, in reliance on the mother's representations, traveled to Arizona, obtained employment, found a place to live, and moved the couple's belongings from California to Arizona. Additionally, in this case, in contrast to *Wells,* all parties were distinctly aware of appellant's intent and desire to rear the child, and the record indicates that the mother's family deliberately withheld information in order to avoid potential "problems" with appellant, who they knew would obstruct the adoption.

Furthermore, because the baby in this case was born one or more weeks early, and because appellant was travelling between California and Arizona and subsequently could not contact the mother, appellant was unaware of the birth until three days after the child had been born

and one day after a petition for adoption had been filed and temporary custody awarded. In contrast, Wells knew of the birth the same day, which was the day before the child was relinquished, and Sanchez was actually at the hospital and visited the mother and child prior to the time the child was relinquished. Further, "[w]hen Sanchez went to the hospital on [the day the child was relinquished], he did not protest the mother's decision to place the child for adoption." *Sanchez*, 680 P.2d at 755.

Our examination of the relevant circumstances thus leads us to conclude that the circumstances in *Wells* and *Sanchez*, on which this Court based its prior rulings as to "impossibility" and "reasonable opportunity," are not present in the case before us. Further, the standards enunciated in those cases were developed in recognition of the need to balance the competing interests in this type of case: the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers. *See Wells*, 681 P.2d at 202–03. In all but the most exceptional cases, the operation of section 78–30–4 achieves that balance as it affords putative fathers the opportunity to assert and protect their rights while providing a finite point at which the state's interest supercedes that of the father. However, where a father does not know of the need to protect his rights, there is no "reasonable opportunity" to assert or protect parental rights. In such a case, the operation of the statute fails to achieve the desired balance and raises serious due process concerns. Although we have previously established that actual notice is not required prior to termination of parental rights under section 78–30–4(3), *Wells*, 681 P.2d at 207, that determination was based at least in part on the assumption that "[n]otice requirements may be satisfied when necessarily implied," *Ellis*, 615 P.2d at 1256, n. 16 (citation omitted), i.e., in the usual case where the putative father knows or should know of the birth and can reasonably take the timely action required to avoid the statutory bar. Under the circumstances of this case, however, including the clearly articulated intent of the father to keep and rear the child, the full knowledge of that intent on the part of all involved, the representations made by the mother, the actions of her family, the premature birth, and the non-residency of the father coupled with his absence at the time of birth, we cannot say that this was either a usual case or that notice may be implied. We therefore conclude that appellant has successfully shown "that the termination of his parental rights was contrary to basic notions of due process, and that he came forward within a reasonable time after the baby's birth, [such that] he should be deemed to have complied with the statute." *Id.* at 1256. The judgment is reversed.

HALL, C.J., and ZIMMERMAN, J., concur.

STEWART, Justice (dissenting):

I respectfully dissent. In my view, the majority opinion departs from the standards established in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-Day Saints*, Utah, 615 P.2d 1250 (1980), *Wells v. Children's Aid Society of Utah*, Utah, 681 P.2d 199 (1984), and *Sanchez v. L.D.S. Social Services*, Utah, 680 P.2d 753 (1984), for the termination of an unwed father's paternal rights to his child. I submit that the trial court properly applied those cases and that the majority opinion, which purports to distinguish those cases, in fact overrules *sub silentio Sanchez*, and in effect requires that actual notice be given unwed fathers before their paternal rights can be terminated and a valid adoption accomplished, even though U.C.A., 1953, § 78–30–4(3) imposes no such requirement. The decision, I submit, will have the most unfortunate effects in the lives of numerous children who are born out of wedlock and placed for adoption.

U.C.A., 1953, § 78–30–4(3) provides that an unwed father may legally establish his paternal right to a child he has fathered out of wedlock by filing a notice of claim

prior to the initiation of adoption proceedings. If he does so, no adoption may take place without either his consent or a determination that he has abandoned or neglected his child. However, a father who fails to file a notice is deemed to have abandoned his child and "waive[s] and surrender[s] ... any right to notice of or to a hearing in any judicial proceeding for the adoption of said child ...." § 78–30–4(3)(c). The policy of the act is not to punish the father, but to provide, if the mother consents and the father fails to act, a certain and efficient procedure for placing a child as quickly as possible with adoptive parents who can raise and nurture the child in an environment free of fear that the adoption process will be abrogated and the psychological security of the child damaged, perhaps permanently. In *Wells v. Children's Aid Society of Utah, supra,* 681 P.2d at 206–07, the Court stated:

[T]he state has a compelling interest in speedily identifying those persons who will assume a parental role over newborn illegitimate children. Speedy identification is important to immediate and continued physical care and it is essential to early and uninterrupted bonding between child and parents. If infants are to be spared the injury and pain of being torn from parents with whom they have begun the process of bonding and if prospective parents are to rely on the process in making themselves available for adoptions, such determinations must also be final and irrevocable.

## I.

The majority holds that due process does not permit termination of a father's rights to a newborn child born out of wedlock "where a father does not know of the need to protect his rights, [and] there is no 'reasonable opportunity' to assert or protect parental rights." In fact, the father in this case had a reasonable opportunity to assert his rights, and the Court's ruling is squarely at odds with the trial court's findings and with this Court's rulings in *Ellis, Wells,* and *Sanchez.* In *Wells,* we explicitly stated, "Due process does not require

that the father of an illegitimate child be identified and personally notified before his parental right can be terminated." *Wells, supra,* 681 P.2d at 207.

The first case this Court decided under section 78–30–4 was *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-Day Saints,* Utah, 615 P.2d 1250 (1980). In *Ellis,* the unwed parents of a child were residents of the state of California. Shortly before the birth, and without notifying the father, the mother moved to Utah for the purpose of delivering her child. Acting with all possible speed, the father finally located the mother, came to Utah, and immediately filed a notice under the statute. Recognizing that a "situation may arise when it is impossible for the father to file the required notice of paternity prior to the statutory bar, through no fault of his own," *id.* at 1256, we held that the father was entitled to an opportunity to show that *"as a factual matter ... he could not reasonably have expected his baby to be born in Utah." Id.* (Emphasis added.) Accordingly, this Court remanded the case to the trial court for a hearing on that issue. In *Ellis,* the Court was not concerned with whether the father in fact had actual notice of his statutory rights under section 78–30–4(3), although he appeared to be aware of those rights.

*Wells v. Children's Aid Society of Utah,* Utah, 681 P.2d 199 (1984), was the next case decided under section 78–30–4. The Court unanimously affirmed the proposition established in *Ellis* that the critical test was whether it was *"impossible"* for the father to make a filing of the statutory notice. *Id.* at 207. The Court ruled that the father in that case had failed to meet either one of the "two essential elements of the *Ellis* exception: it was [not] (1) 'impossible' for the father to make a timely filing of the required notice (2) 'through no fault of his own.' " 681 P.2d at 208. The Court stated:

Otherwise, the need to prove in each adoption case that the unwed father— whoever he may be—had a "reasonable

opportunity" to file the required notice of paternity would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status.

*Id.* We specifically addressed and unanimously rejected the very proposition that the majority now holds is the law:

Due process does not require that the father of an illegitimate child be identified and personally notified before his parental right can be terminated. In the common cases of unwed fathers without desires to assume the responsibilities and to claim the rights of parenthood, such a requirement would frustrate the compelling state interest in the speedy determination described above. It would also threaten the privacy interests of unwed mothers and frustrate the other interests the United States Supreme Court cited in *Lehr v. Robertson* . . . .

*Id.* at 207.

In *Wells*, we also noted that the United States Supreme Court had also rejected a similar constitutional argument that an unwed father should receive personal notice of an adoption proceeding. *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). *See Wells, supra,* 681 P.2d at 205–06.

In *Sanchez v. L.D.S. Social Services,* Utah, 680 P.2d 753 (1984), the father had no knowledge of the necessity to file a notice of paternity until *after* the baby had been placed with an adoption agency exactly as in the instant case. *Sanchez* squarely held, over the lone dissent of Justice Durham, that it was not pertinent whether the father had actual knowledge of the statutory requirement that he file a notice to preserve his paternal right, and that strict compliance with the statute is required. *Id.* at 755 & n. 2. The legislative policy embodied in section 78–30–4(3) requires as much:

In *Wells* we expressly held that a father who tried to register in a timely fashion, but did not do so, was not entitled to notice. *Wells* controls the issue here. It is of no constitutional importance that Sanchez came close to complying with the statute. Because of the nature of [the] subject matter dealt with by the statute, a firm cutoff date is reasonable, if not essential.

In referring to the dissent, we wrote:

The consequence of the position asserted by the dissent would be to promote litigation in a number of adoption cases, thereby holding the rights of putative adoptive parents, and the rights of the natural mother, whatever they may be, in limbo while the courts undertake to make a decision based on criteria nowhere articulated by the dissent, but which would, no doubt, involve the degree of the father's diligence and sincerity in trying to establish his parental rights, factors which are foreign to the statutory provisions. The damage done by the actual and potential disruption of the adoption system by protracted litigation of such cases would be especially incalculable as to the children involved. The harm caused to infants, who need stable relationships with adults for the psychological bonding necessary for their well-being and character development, could be incurable.

The dissent concedes the facial constitutionality of § 78–30–4, but contends that the statute is unconstitutional as applied in this case. . . . Sanchez lived in this state throughout the pregnancy, knew of the time and place of the birth of the child, *and was presumed to know the law.*

*Sanchez,* 680 P.2d at 755 (paragraphs reversed.)

In both *Wells* and *Sanchez,* the fathers knew that their children would be born in this state long prior to their actual births, and in the instant case the father must have realized that there was a reasonable likelihood that that would be the case. It cannot be said, therefore, that it was "impossible" for the appellant to protect his paternal rights.

That an unwed father may need legal advice to protect his rights may often be true, but legal advice is frequently necessary to protect one's legal rights. Further-

more, none of the three prior cases decided by this Court held that an unwed father has, at the time of birth, a constitutionally protected parental right to the newborn child, and no United States Supreme Court opinion has taken that position either. *See Lehr v. Robertson,* 463 U.S. 248, 260–62, 103 S.Ct. 2985, 2992–94, 77 L.Ed.2d 614 (1983). Yet, the majority in this case, without any authority and with no analysis whatsoever, simply declares as an *ipse dixit* that the father in this case has a constitutional right to the child he has fathered, and that he must be given notice before his right can be terminated. I submit that the majority has ruled that section 78–30–4 is unconstitutional *on its face,* even though this Court in *Ellis* and *Wells* expressly declared that it is constitutional on its face, and the Court does so again in this case.

## II.

The majority opinion declares section 78–30–4 facially constitutional, but holds that it may not be constitutionally applied to terminate the appellant's claim to the child he fathered. The majority not only repudiates the rules established by *Ellis, Wells,* and *Sanchez,* but also overrides the trial court's findings of fact.

The district court found:

1. The natural mother of Baby Boy Doe knowingly and intelligently consented to Baby Boy Doe's adoption and waived her rights as his natural mother on August 27, 1984.

. . . .

3. Petitioners Burn filed the petition to adopt Baby Boy Doe in good faith on August 27, 1984.

. . . .

8. Mr. Aguilar filed his Notice of Claim of paternity with the Utah Department of Social Services on August 29, 1984, at 2:00 p.m.

9. Mr. Aguilar's Notice of Claim was filed two days after petitioners Burn filed the petition for adoption and took custody of Baby Boy Doe.

10. *Mr. Aguilar knew that the natural mother was residing in Utah during the last three months of her pregnancy.*

11. Mr. Aguilar visited the natural mother in Utah immediately prior to the birth of Baby Boy Doe.

12. When Mr. Aguilar visited the natural mother in Utah, there was some discussion about placing Baby Boy Doe for adoption.

13. *Mr. Aguilar knew or had reason to know that the natural mother intended to place Baby Boy Doe for adoption.*

14. *Mr. Aguilar knew that the natural mother was susceptible to influence from the relatives with whom she was residing in Utah in that they wanted her to place Baby Boy Doe for adoption.*

15. *It was not impossible for Mr. Aguilar to have filed his Notice of Claim prior to the filing of the adoption petition by petitioners Burn.*

16. Mr. Aguilar had a reasonable opportunity to file the Notice of Claim before the petition to adopt was filed.

(Emphasis added.)

Based on these findings and the law established in *Ellis, Wells,* and *Sanchez,* the trial court properly reached the legal conclusion that the appellant had a reasonable opportunity to file a "Notice before the petition to adopt was filed by petitioners Burn." The majority purports to distinguish *Ellis, Wells,* and *Sanchez,* and holds the trial court's conclusion erroneous on the ground that since the appellant "was not a Utah resident and during the relevant period had spent less than a week in this state, most of which time was spent on a camping trip," he did not have a reasonable opportunity to file. What "the relevant period" referred to by the majority is meant to be is not explained. It is, however, clear from the trial court's findings that the appellant had *three months* to file his notice and did not. The majority fails to explain why that is not a reasonable and sufficient time. It is of no significance whatsoever that the child's mother indicated to the appellant prior to the birth of

the baby that she would move with him to Arizona. Nor is it significant that the baby was born early, or that the father misjudged or was misled as to when the baby would be born. Due process limits state action, not the actions of private parties. *See Sanchez v. L.D.S. Social Services,* Utah, 680 P.2d 753, 755 n. 2 (1984).

The appellant knew where the mother was long before the birth occurred and had ample time to take the necessary legal action, quite unlike the father in *Ellis v. Social Services Department,* Utah, 615 P.2d 1250 (1980). It is irrelevant that the appellant was not in Utah at the time of the actual birth of the child.

### III.

Notwithstanding the rulings in *Ellis, Wells,* and *Sanchez,* the majority now adopts the position of the only dissent filed in our line of cases. *See Sanchez v. L.D.S. Social Services,* Utah, 680 P.2d 753 (1984) (Durham, J., dissenting), and rejects the law established in *Ellis, Wells,* and *Sanchez,* where we sought to impart finality to adoption proceedings for the benefit of the thousands of children who each year are born out of wedlock. Today's ruling, making the validity of many adoption proceedings turn on the majority's notion of "fairness" and adequacy of notice to the father, will call in question the validity of one adoption proceeding after another, and each will have to be resolved on the basis of the subjective notions of "fairness" of any given majority of justices. The effect of today's decision, I submit, will be to substitute a state of disorder and unpredictability for a state of order and predictability in a critical area of the law where predictability is essential to the welfare of adopted children. Children born out of wedlock whom their mothers wish to give up for adoption, as well as putative adoptive parents of such children, will be held hostage to fathers who fail to file timely notices of paternity and later come into court asserting that they did not know their "rights" and did not have a fair chance to file. The bonding of adopted children, and the psychological security of adoptive parents, will be subject to being torn asunder on the basis of a subjective, standardless judgment by a majority of this Court.

HOWE, J., concurs in the dissenting opinion of STEWART, J.