**Mario G. BELTRAN, Plaintiff and Appellant,**

v.

**Denise ALLAN; LDS Social Services, an agency of The Church of Jesus Christ of Latter-day Saints; and John Does I through V, Defendants and Appellees.**

No. 960079–CA.

Court of Appeals of Utah.

Oct. 24, 1996.

Robert L. Moody, Provo, for Plaintiff and Appellant.

David M. McConkie and Merrill F. Nelson, Salt Lake City, for Defendants and Appellees.

Before BENCH, BILLINGS and JACKSON, JJ.

BENCH, Judge:

Plaintiff appeals the trial court's grant of summary judgment to defendants and denial of plaintiff's cross motion for summary judgment. We affirm.

## FACTS

Plaintiff and defendant Allan were both single residents of California when they began dating in 1993. As a result of that relationship, Allan became pregnant. In March of 1994, Allan informed plaintiff of her pregnancy and that he was the father. Shortly thereafter, the parties stopped dating and Allan expressed her intent to place the child for adoption. Plaintiff was not agreeable to the adoption and voiced interest in raising the child himself.

Allan contacted LDS Social Services in California about placing the baby for adoption. At Allan's request, plaintiff completed background information forms which were returned to LDS Social Services, although plaintiff indicated thereon that he had not agreed to the adoption. In August of 1994, Allan moved to Provo, Utah, to stay with her aunt until the child's expected birth in November. While in Provo, Allan communicated with plaintiff and his mother by telephone and mail, continually maintaining her intent to place the child for adoption.

■ Plaintiff consulted with three different California attorneys about stopping the Utah adoption, but they told plaintiff that they did not know Utah law and could not help him.[1] In late October 1994, plaintiff filed a paternity action in California seeking blood tests to determine whether he was the father and, if determined to be the father, requesting sole legal and physical custody of the child. Plaintiff's complaint alleged that Allan had "moved to Utah and plans to release the child for adoption." The complaint, summons, and restraining order were mailed to Allan in Provo asking her to sign a Notice of Acknowledgment and Receipt accepting service of the documents, which she did not do.[2]

Also in late October 1994, LDS Social Services in Provo mailed a letter to plaintiff informing him that Allan intended to place the child for adoption through the agency and encouraging plaintiff to provide the agency with additional information. Plaintiff did not comply with this request.[3] On November 14, 1994, Allan gave birth to a child in a Utah County hospital. Three days later, Allan executed a relinquishment and consent to adoption and the agency placed the child with the adoptive parents that same day. The adoptive parents are the only parents the child has ever known.

At no time has plaintiff filed an acknowledgment of paternity with the Utah Department of Health, registrar of vital statistics.

---

1. This information comes from excerpts of plaintiff's deposition, which were quoted by Allan in a memorandum submitted to the trial court. Allan moved the trial court to admit the entire deposition, but there is no order in the record either granting or denying the motion. Nonetheless, because the quoted excerpts of the deposition were presented to the trial court without objection, they are part of the record on appeal. *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 899 n. 3 (Utah 1992) (holding excerpts of depositions argued to trial court were part of the record on appeal where there were no objections below); *see also* Utah R.Civ.P. 32(d) ("Use of a deposition under Subsection (a) of this rule shall have the effect of publishing the deposition unless the court orders otherwise in response to objections.").

2. The California action was later dismissed by stipulation of the parties and exclusive jurisdiction for this case was determined to be in Utah.

3. Plaintiff asserts that, in response to this letter, he called LDS Social Services and they hung up on him. In his deposition, excerpts of which were included in defendants' memorandum to the trial court, *see* note 1, supra, plaintiff admits he never talked on the phone with anyone from LDS Social Services in Utah. The dissent suggests that plaintiff is entitled to an evidentiary hearing on these "pivotal facts." In view of the controlling law in this jurisdiction, however, whether plaintiff actually attempted to speak with LDS Social Services in Utah is not a "genuine issue as to any *material* fact." Utah R.Civ.P. 56(c) (emphasis added).

Instead, eight weeks after the child was relinquished by the mother and placed with the adoptive parents, plaintiff filed the instant action wherein he sought custody and various damages and costs. After discovery, defendants filed a motion for summary judgment, to which plaintiff filed an objection and a cross motion for summary judgment seeking custody of the child. The trial court granted summary judgment to defendants. Plaintiff appeals the trial court's decision, claiming: (1) there were disputed issues of fact that precluded summary judgment; (2) he was excused from filing an acknowledgment of paternity because his situation satisfied the statutory impossibility exception; and (3) the statutory requirement to file a notice of acknowledgment of paternity is unconstitutional as applied to him.

## STANDARD OF REVIEW

■■■ Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Warburton v. Virginia Beach Fed. Sav. & Loan Ass'n*, 899 P.2d 779, 781 (Utah App.1995). When reviewing summary judgment, we review the facts in the light most favorable to the losing party. *Id.* Because summary judgment is granted as a matter of law, we review the trial court's ruling on legal issues for correctness. *Id.* " 'We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact.' " *Berenda v. Langford*, 914 P.2d 45, 50 (Utah 1996) (citation omitted).

## ANALYSIS

To establish any interest in a child born outside of marriage, the putative father must file a notice of paternity with the Department of Health. Utah Code Ann. § 78–30–4.8(2)

(Supp.1994).[4] The notice of paternity may be filed prior to the birth of the child, but must be filed prior to the time the child is relinquished by the mother to a licensed child placement agency or prior to the filing of a petition by adoptive parents. *Id.* § 78–30–4.8. If the putative father fails to file a notice of paternity, he is "barred from thereafter bringing or maintaining any action to assert any interest in the child." *Id.* § 78–30–4.8(3). "[F]ailure to file a timely notice of paternity shall be deemed to be a waiver and surrender of any right to notice of any hearing in any judicial proceeding for adoption of the child, and the consent of that person to the adoption of the child is not required." *Id.* § 78–30–4.8(4). To meet constitutional requirements, the statute provides for an exception to the strict filing requirement. The exception exists when the putative father can prove by clear and convincing evidence that, through no fault of his own, it was not possible for him to file a notice of paternity within the specified period, and he filed a notice of paternity within ten days of when it became possible for him to file. *Id.* § 78–30–4.8(3)(a)–(c).

## Material Issues of Fact

■■■ Plaintiff claims there were material issues of fact in dispute precluding summary judgment. However, none of the material facts in this case are disputed. Plaintiff knew that Allan was pregnant, that she intended to place the child for adoption in Utah, and that she went to Provo to reside with her aunt until the child's birth when she would place the child for adoption. Despite this knowledge, plaintiff did not file a notice of paternity prior to the child's birth, or prior to the child's placement with the adoption agency. In fact, plaintiff has never filed a notice of paternity. Plaintiff is therefore statutorily precluded from maintaining any action to assert any interest in the child. *See id.* § 78–30–4.8(3); *see also In re Adoption of W*, 904 P.2d 1113, 1120 (Utah App.1995).

**4.** The relevant statutes have been amended and revised since this case, but we review the statutes as they existed when the action was filed. However, the result would be no different under the amended law because even though the parties came from out of state, plaintiff knew Allan was in Utah to place the child for adoption. *See* Utah Code Ann. § 78–30–4.15(4) (Supp.1996).

## Impossibility Exception

■ Plaintiff claims, however, that his situation satisfies the statutory "impossibility" exception. *See* Utah Code Ann. § 78–30–4.8(3)(a)–(c) (Supp.1994). We disagree. Plaintiff cannot say that it was impossible for him to file a timely notice of paternity through no fault of his own when, by his own admission, he knew of the pregnancy and that the mother was in Utah to place the child for adoption. The extent of his knowledge is reflected in the action he filed in California nearly three weeks prior to the child's birth, wherein he affirmatively alleged that he knew Allan was in Utah and that she planned to place the child for adoption. Plaintiff has never, even to this date, bothered to file the notice of paternity required by the statute. *See id.* § 78–30–4.8(3)(c).

■ Plaintiff contends that his efforts in expressing opposition to the adoption to Allan and the adoption agency, together with his filing of the California action and the instant action, should relieve him from the statutory notice of paternity requirements. However, the statutes demand strict compliance with the notice of paternity requirement and not even substantial compliance will suffice. *Adoption of W,* 904 P.2d at 1120–21.

In *Adoption of W,* the biological parents were unmarried and residents of Indiana when they conceived a child. *Id.* at 1115. The mother thereafter went to Nevada, where the child was born and immediately placed with an adoption agency. The mother first claimed that she did not know who the father was because she had been raped, but later admitted to knowing the father's identity. The father claimed that he did not know the mother went to Nevada to place the child for adoption, professing that he and the mother had made plans to marry and raise the child together. One day after the child's birth, the father filed a paternity action in Indiana. About one week later, the child was placed with the adoptive parents who had filed an adoption petition in Utah. Shortly after the child's birth, the mother told the father of the adoption. The father and his Indiana attorney both contacted the adoptive parents' attorney by telephone more than one month later. After another two months

had passed, the father's Utah attorney called the adoptive parents' attorney stating his objection to the adoption, and later filed an objection in Utah. Eight months after learning the child had been placed for adoption, the father filed a notice of paternity. *Id.*

This court held in *Adoption of W* that because the father had not filed his notice of paternity until eight months after learning of the adoption: (1) the father's consent was not required for the adoption to take place; (2) the father had not preserved his right to object to the adoption; and (3) the father failed to meet the requirements of the impossibility exception. *Id.* at 1120–21. Filing a paternity action in another state did not establish the putative father's parental rights where he failed to timely file a notice of paternity in Utah. *Id.*

The facts in *Adoption of W* were much more favorable to the putative father's position than those in the instant case. The putative father in *Adoption of W* had been told by the mother that she would marry him and they would raise the child together. *Id.* at 1115. Further, he did not know the mother's whereabouts or her intent to place the child for adoption but, upon finding out, he eventually filed the required notice of paternity. *Id.* By comparison, plaintiff in this case knew all along of Allan's intent to place the child for adoption and knew she was in Utah for that purpose. Plaintiff was not surprised by the adoption, nor was he misled into believing there would be no adoption. Furthermore, plaintiff never filed a notice of paternity in Utah.

The Utah Supreme Court has rejected alternative means for establishing paternal rights that fall short of the statutory requirement of filing a timely notice of paternity. *Sanchez v. LDS Social Servs.,* 680 P.2d 753, 755 (Utah 1984). In *Sanchez,* the putative father maintained his opposition to adoption when communicating with the child's mother and a counselor at LDS Social Services, although he failed to file a timely notice of paternity. *Id.* at 754. A majority of the supreme court held that the father forfeited any interest he had in the child. *Id.* at 755–56. One dissenting justice urged, under notions of fairness and due process, that the

father had taken sufficient steps, short of filing a notice of paternity, to assert his rights and therefore should not be statutorily barred from challenging the adoption. *Id.* at 756–57 (Durham, J., dissenting). In response, the majority held as follows:

> The consequence of the position asserted by the dissent would be to promote litigation in a number of adoption cases, thereby holding the rights of putative adoptive parents, and the rights of the natural mother, whatever they may be, in limbo while the courts undertake to make a decision based on criteria nowhere articulated by the dissent, but which would, no doubt, involve the degree of the father's diligence and sincerity in trying to establish his parental rights, factors which are foreign to the statutory provisions. The damage done by the actual and potential disruption of the adoption system by protracted litigation of such cases would be especially incalculable as to the children involved. The harm caused to infants, who need stable relationships with adults for the psychological bonding necessary for their well-being and character development, could be incurable.
>
> ... It is not too harsh to require that those responsible for bringing children into the world outside the established institution of marriage should be required either to comply with those statutes that accord them the opportunity to assert their parental rights or to yield to the method established by society to raise children in a manner best suited to promote their welfare.

*Id.* at 755–56.

The policy reasons for the statutory bright-line rule are compelling. If, in each adoption case, the putative father's diligence to establish his parental rights had to be individually assessed, the finality of our adoption system would be seriously undermined. *Wells v. Children's Aid Soc'y,* 681 P.2d 199, 208 (Utah 1984) (holding analysis of whether father had "reasonable opportunity" in each individual adoption case to comply with statutory requirements "would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status"). Because of the unique nature of adoptions, "a firm cutoff date is reasonable, if not essential." *Sanchez,* 680 P.2d at 755.

## Unconstitutional as Applied to Plaintiff

▪ Plaintiff next argues the statutes that require the filing of a notice of paternity are unconstitutional as applied to him. In support of this claim, plaintiff cites *In re Adoption of Baby Boy Doe,* 717 P.2d 686 (Utah 1986). In *Adoption of Baby Boy Doe* the supreme court reversed the trial court's termination of a putative father's paternal rights because everyone involved knew of the father's opposition to adoption, the father was not a Utah resident and was absent at the time of birth, the mother had falsely represented she would not place the child for adoption, and her family had "deliberately withheld information" from the father about the mother's plans for adoption. *Id.* at 690. Because of the mother's misrepresentations and the actions of her family, the father did not know of his need to protect his rights. *Id.* at 691. The facts in the instant case are very different from *Adoption of Baby Boy Doe* in that Allan never told plaintiff she would abandon her adoption plans. Allan continually maintained her intent to place the child for adoption. Plaintiff, therefore, cannot argue that he was deceived or lulled into believing he did not need to take proper steps to protect his rights.

▪ Plaintiff also asserts that an adoption agency licensed by the State should have the duty to mail a blank notice of paternity form to the putative father with instructions on where and how to file it in order to establish his parental rights and defeat the adoption. Giving actual notice of statutory requirements to putative fathers is clearly not constitutionally required. *Lehr v. Robertson,* 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983) (holding no violation of due process where putative father was not given special notice, even though court and mother knew he had filed an action in another court, because father was capable of asserting and protecting his own rights); *Wells,* 681 P.2d at 207 ("Due process does not require that the father of an illegitimate child be identified and personally notified before his parental right can be terminated."); *San-*

*chez,* 680 P.2d at 755 (holding "there is no constitutional requirement that § 78–30–4 give actual notice of the statutory requirements for establishing paternal rights").

▮▮▮ Ignorance of the law does not relieve a putative father from having to comply with the statutory requirement to register a notice of paternity. *Lehr,* 463 U.S. at 264, 103 S.Ct. at 2995. In upholding a similar statutory scheme from New York, the United States Supreme Court stated:

> By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [the child]. The possibility that he may have failed to do so because of his ignorance of the law cannot be a sufficient reason for criticizing the law itself.

*Id.* An adoption agency is therefore not legally required to alert the putative father of what he must do to establish his rights. As a matter of good business practice, however, the agency may choose to refer to the controlling statutes in correspondence it may have with the putative father.[5] Such a practice would undoubtedly reduce the litigation expenses of the agency.

▮▮▮ We are not unsympathetic to plaintiff's plight as an unwed father. However, the legislature has made the policy decision that the father of a child born outside of wedlock must comply with the strict requirements of Utah law in order to establish his parental rights. As support for her dissent, Judge Billings quotes the dissenting opinions in some of the pertinent case law and refers to statutes from other states. However, it is the Utah statute, as interpreted by majority holdings of the Utah Supreme Court, which controls the outcome of this case. This court is bound to follow controlling decisions of the Utah Supreme Court. *State v. Menzies,* 889 P.2d 393, 399 n. 3 (Utah 1994) (holding vertical stare decisis "compels a court to follow strictly the decisions rendered by a higher

court") (citation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995). Utah law requires strict compliance to provide certainty and finality to adoptions so that the parties involved, especially the child, are not compromised. *Sanchez,* 680 P.2d at 755–56.

## CONCLUSION

The undisputed facts in this case establish that plaintiff knew of Allan's intent to place the child for adoption in Utah, and that she was residing here for that purpose, and yet he failed to file the requisite notice of paternity. There is no dispute to these facts, and an evidentiary hearing would be of no benefit. These facts also preclude plaintiff from claiming refuge in the impossibility exception provided by statute because he cannot show that, through no fault of his own, he was unable to file a timely notice of paternity, but that upon being able to file, he did so within ten days. Finally, the applicable adoption statutes are not unconstitutional as applied to plaintiff given his knowledge of Allan's intent to place the child for adoption, his ability to protect his rights by filing a notice of paternity, and the absence of misrepresentations or withholding of evidence by Allan.

We therefore affirm the summary judgment.

JACKSON, J., concurs.

BILLINGS, Judge (dissenting):

I respectfully dissent as I would reverse the trial court's granting of summary judgment in favor of the mother and LDS Social Services. Under the facts alleged in this case, I believe the father deserves, at the least, an evidentiary hearing to determine whether the adoption statute as applied to him denied him due process of law.

Utah courts have consistently found Utah's adoption statute facially constitutional under

---

5. The dissent refers to the letter sent by the Provo office of LDS Social Services in this case, wherein it requested additional information from plaintiff. The record contains a copy of the letter that states, "It would be helpful if you could complete the family history pages and the WAIV-ER (in duplicate) signed in the presence of a

notary." The dissent surmises that the waiver requested was a waiver of parental rights. However, the waiver could have been a waiver of the confidentiality of the family history information. We simply cannot say what the waiver in the form referred to because it is not part of the record.

due process standards. *See, e.g., Wells v. Children's Aid Soc'y*, 681 P.2d 199, 207 (Utah 1984); *In re Adoption of W*, 904 P.2d 1113, 1121–22 (Utah App.1995) (plurality opinion). However, in two cases the supreme court has remanded for evidentiary hearings to determine if the statute as applied violated due process. *See In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986) (" '[A] statute fair upon its face may be shown to be void and unenforceable as applied.' ") (citation omitted); *Ellis v. Social Servs. Dep't*, 615 P.2d 1250, 1256 (Utah 1980) ("[D]ue process requires that [the father] be permitted to show that he was not afforded a reasonable opportunity to comply with the statute."). In another case before this court, we recognized that an evidentiary hearing would have benefited an unwed father who untimely filed his notice of paternity and held that the statute, as applied, violated the father's due process rights as a matter of law. *In re K.B.E.*, 740 P.2d 292, 297 (Utah App.1987). In general, "the standards enunciated in those cases were developed in recognition of the need to balance the competing interests in this type of case: the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers." *Adoption of Baby Boy Doe*, 717 P.2d at 691.

This court has recognized "the statute was 'not created to encourage a "race" for placement to cut off the rights of fathers who are *identified and present*.' " *K.B.E.*, 740 P.2d at 296 (quoting *Sanchez v. LDS Social Servs.*, 680 P.2d 753, 756 (Utah 1984) (Durham, J., dissenting)). Similarly, the supreme court has recognized the statute "was designed to facilitate permanent and secure placement of illegitimate children whose unwed mothers wish to give them up for adoption and whose unwed fathers *take no steps* to officially identify themselves and acknowledge paternity." *Swayne v. LDS Social Servs.*, 795 P.2d 637, 641 (Utah 1990) (emphasis added); *see also Lehr v. Robertson*, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983) ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood by '*com[ing] forward* to participate in the rearing of his child,' ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause.") (citation omitted); *Swayne*, 795 P.2d at 646 ("[W]here the father's identity was known to all concerned, he had informally acknowledged his paternity, he was readily available, he had indicated a desire to participate in the raising of the child, but he had failed to file a formal acknowledgment of paternity," the adoption statute violates equal protection.) (Zimmerman, J., concurring and dissenting).

In this case, the nineteen-year-old, admitted father clearly asserted his interest in having custody of his child immediately upon being told of his girlfriend's pregnancy. Throughout the mother's pregnancy, whenever he was contacted by the mother or LDS Social Services, he continued to express his opposition to an adoption and his desire to have custody of his child. As soon as the father discovered the mother had relocated to Utah to give birth to the child, he filed a paternity action in California. In this action, he admitted paternity and asked for sole legal and physical custody. He also requested a restraining order to prevent the mother from placing the child for adoption. Furthermore, almost two weeks before the child was born, the father notified both the mother and LDS Social Services by certified mail that he had filed this action and was seeking custody of the child.

Two days after the father had instituted his paternity action, he received the following letter from LDS Social Services:

> This letter is to inform you that Denise Allan is being assisted by this agency in making an adoption plan for her child which is due to be delivered the end of November 1994. She has named you as a possible father of her unborn child....
>
> Thank you for the background information you have already completed. It would be helpful if you could complete the family history pages and the WAIVER (duplicate) signed in the presence of a notary....

This letter well could have misled the father into believing his rights were protected as long as he did not sign and return the waiver. The father immediately responded by mailing LDS Social Services the following

letter along with a copy of the action he had filed in California:

Please be advised that I have filed a Complaint to Establish a Paternal Relationship requesting custody of our unborn child in the Superior Court of California, Case No. PF000505.

I do not intend to give up any of my paternal rights to this child, and ... I intend to pursue custody of my child as vigously [sic] as possible.

I am enclosing a copy of the action filed here on October 26, 1994, and [the mother] will be served with this action as quickly as that can be arranged.

If you have any questions, please contact me.

He received no response. The father also called Beverly R. Becker, the person at LDS Social Services who had sent him the letter. He told her that he intended to take custody of the child rather than permit the mother to place the child for adoption. Ms. Becker hung up on the father.[1]

Defendant's temporary move to Utah put the father at a distinct disadvantage in attempting to assert his parental rights. Our case law, as well as the recent amendments to the adoption statute, recognize that an unwed father who resides out of state is in a more difficult position to strictly comply with Utah's statutory procedures. *See* Utah Code Ann. § 78–30–4.15(4) (Supp.1996) ("The Legislature finds that an unmarried biological father who resides in another state may not, in every circumstance, be reasonably presumed to know of, and strictly comply with, the requirements of this chapter."); *Swayne,* 795 P.2d at 642 (Utah 1990) (listing father's out-of-state residency as a factor for determining whether it was impossible for father to file timely notice of paternity); *Adoption of Baby Boy Doe,* 717 P.2d at 691 (same).

In this case, both the mother and LDS Social Services were fully aware of the fa-

ther's opposition to the adoption, his desire for custody of his child, and his initiation of legal steps to protect his parental rights in a California paternity action. All this was known before the child was born and before the mother relinquished the child for adoption. Unlike the unwed fathers in other cases dealing with this issue, the father initiated a paternity action and notified all parties involved of such action before the birth of his child. *See, e.g., Adoption of Baby Boy Doe,* 717 P.2d at 691 (remanding for evidentiary hearing because father was not Utah resident and all parties knew of his intent to keep child even though father had not filed notice of paternity or paternity action before child was born or placed for adoption); *Adoption of W,* 904 P.2d at 1115, 1122–23 (plurality opinion) (affirming termination of father's parental rights where father, a resident of Indiana, filed paternity action in Indiana after child was born but did not notify any other parties of action until two months later). Moreover, the father was without the benefit of counsel. He proceeded pro se in his California paternity action. This action and his consistent communication with the mother and LDS Social Services appears to be the only avenues the father knew of to protect his rights to his child.

The majority contends our recent decision in *In re Adoption of W,* 904 P.2d 1113 (Utah App.1995) (plurality opinion), compels the conclusion that the father's due process rights were not violated. First, I note that the analysis in this case is not controlling legal precedent as both Judge Davis and I merely concurred in the result. *Id.* at 1123. Further, I believe there are significant factual differences between these cases. Although in both cases the father filed a paternity action in another state, in *Adoption of W* the father filed his action after the adoption petition was filed and did not notify anyone of his action until two months later. *Id.* at 1115. In contrast, the father in this case filed his paternity action and notified both

---

1. The majority discounts the father's affidavit recalling this event by relying on a subsequent deposition response that appears to contradict his affidavit. However, " '[a]ffidavits and depositions submitted in support of and in opposition to a motion for summary judgment may be used only to determine whether a material issue of fact exists, not to determine whether one party's case is less persuasive than another's.' " *Ron Shepherd Ins. v. Shields,* 882 P.2d 650, 655 (Utah 1994) (citation omitted). In my view, these are precisely the sort of pivotal facts that should have been determined in an evidentiary hearing before the trial court.

the mother and LDS Social Services before the child was born or placed for adoption. Also, throughout this case, the father persistently and diligently corresponded with the mother and the agency, attempting to assert his parental rights in his child. In *Adoption of W,* the father repeatedly went months between sporadic actions. *Id.* It was this inconsistent behavior which allowed me to concur in the result in *Adoption of W.*

The majority concludes the *Adoption of W* father had a stronger case than the father in the present case because he eventually filed a notice of paternity over eight months after he learned the child was the subject of adoption proceedings in Utah. However, here, the father instituted an action in Utah besides his California action within two months of the child's birth and immediately upon learning the California action may not be effective in protecting his rights. Under these facts, relying on the filing of a notice of paternity requirement elevates form over substance in an area where fundamental constitutional rights are involved. Moreover, I agree with the father that once the statutory period had elapsed and it was clear all parties knew of his objection to the adoption and his desire to have custody of his child, a late filing of the notice would have been futile. It is well established that the law does not require litigants to do a futile or vain act. *See, e.g., Jenkins v. Equip. Ctr., Inc.,* 869 P.2d 1000, 1003 (Utah App.1994). Additionally, the putative father in *Adoption of W* was given an evidentiary hearing. 904 P.2d at 1116. Whereas, in this case, the father has been denied a hearing to establish that his constitutional rights were denied.

Further, the facts of this case demonstrate why a prompt evidentiary hearing should have been granted and why the purpose of the adoption statute should govern over rigid form. The statutory registration bar should not be imposed to "protect" the newborn child and adoptive parents from an unwed father who has timely identified himself to the mother, the agency, and the court, and who has repeatedly, before the birth of the child, expressed to all parties involved his desire for custody of his child. Justice White characterized this type of strict compliance with a registration statute, when a father is known to the parties involved, as "a grudging and crabbed approach to due process." *Lehr v. Robertson,* 463 U.S. 248, 275, 103 S.Ct. 2985, 3000, 77 L.Ed.2d 614 (1983) (White, J., dissenting). When an unwed father has "effectively made himself known by other means, ... it is the sheerest formalism to deny him a hearing because he informed the State in the wrong manner." *Id.* (White, J., dissenting).

The majority claims strict compliance with the adoption statute is necessary to "provide certainty and finality to adoptions so that the parties involved, especially the child, are not compromised." I acknowledge that the statutory scheme is necessary and good public policy in the normal situation where it is applied to promptly terminate the parental rights of an unknown or disinterested unwed father. I also have great sympathy for the adoptive parents involved in this case and consider them, along with the child, innocent victims of a misapplication of the statutory scheme. My concern for each of the parties in this action reinforces my belief that when the identity of the father is known and his desire for custody expressed before the child is relinquished for adoption, a strict application of the registry statute and denial of notice and a hearing to the father fails to promote finality. In *Lehr,* Justice White similarly opined,

> denying notice and a hearing to such a father may result in years of additional litigation and threaten the reopening of adoption proceedings and the vacation of the adoption. Here, the Family Court's unseemly rush to enter an adoption order after ordering that cause be shown why the filiation proceeding should not be transferred and consolidated with the adoption proceeding can hardly be justified by the interest in finality. To the contrary, the adoption order entered ... has remained open to question until this very day.

*Lehr,* 463 U.S. at 276, 103 S.Ct. at 3001 (1983) (White, J., dissenting).

Certainly it was not the intent of our legislature to create a procedure which works against the speedy establishment of perma-

nent homes for children of unwed parents. The application of the adoption statute in this case has led to two years of prolonged and expensive litigation. Furthermore, the strict application of our statute urged by the majority goes against the better judgment of many of our sister states.[2]

Further, LDS Social Services' disregard for the rights of known unwed fathers is troubling. The majority responds to the father's argument that the agency should have mailed him a notice of paternity form or at least notified him of the filing requirements in Utah, by stating that such notice is not constitutionally required and ignorance of the law is never an excuse. However, I believe this view confuses the use of the term "notice." The case law relied on by the majority are cases stating the father did not properly file his claim of paternity form and thus was not entitled to notice of the adoption proceedings. Requiring the agency to give notice of the adoption proceedings is different than a duty to make the notice of paternity forms available to known unwed fathers objecting to an adoption or the duty to inform a young, out-of-state, unwed father of his legal rights. Utah Code Ann. § 78–30–4.8(1) (1992) provides: "The Department of Health shall provide forms for the purpose of filing the no-

tices of paternity described in this section. Forms *shall* be made available . . . in every licensed child placing agency." (emphasis added). When a state licensed child placement agency that is required to make paternity notice forms available, fails to mention such a requirement to an unwed father, who is in regular contact with them and attempting to assert his interest in his unborn child, the purpose of the statute is frustrated and litigation becomes almost certain.

LDS Social Services responds to the father's argument by claiming it has a duty of loyalty to the mother and thus it should not provide the father with any information. However, this court has stated "[t]he general legislative intent of Utah's adoption statute is 'that in every adoption the best interest of the child should govern and be of foremost concern.'" *In re Adoption of C.M.G.*, 869 P.2d 997, 998 (Utah App.1994) (citation omitted). Also, "[w]hen a private party facilitates a mother's relinquishment, as was the case here, the party becomes a state actor if it also effectuates the state's termination of the father's rights." *Swayne,* 795 P.2d at 640. I believe it is in the child's best interest for an adoption agency to fully inform the father of his rights, for a father to be able to make an informed choice, and for a prompt evidentia-

---

**2.** In each of these states, when an identified father is affirmatively attempting to establish paternity and gain custody, the basic due process requirement of notice is required. Such notice balances the rights of the known father with the ultimate purpose of our statute—the prompt and permanent placement of the child. This system is operating successfully in at least eight states. In three states, an initial notice of a pending adoption must be given to all putative fathers before the child is relinquished to the adoption agency. *See* Ariz.Rev.Stat.Ann. § 8–106(G) (Supp.1995) (requiring initial notice to all potential fathers of intended adoption, of father's right to consent or withhold consent, of father's responsibility to initiate paternity proceedings, of father's right to seek custody, and of father's responsibility to provide financial support when paternity is established); Cal.Fam.Code §§ 7662, 7664 (West 1994) (requiring termination of parental rights if putative father has not denied paternity, waived his right to notice by failing to respond to initial notice that alleges him as putative father, and adoption of child is planned); N.J.Stat.Ann. § 9:3–45 (West Supp.1996) (requiring putative father to respond within twenty days if resident and thirty-five days if nonresident to initial notice informing father of intention to

place child for adoption and need to respond to notice to object to adoption). In three other states notice must be given to or consent obtained from any father whose identity is known, and in one of these states, when the father's identity is ascertainable. *See* Conn.Gen.Stat. Ann. §§ 45a–717, 46b–172a (West 1995 & Supp. 1996) (allowing putative father to receive notice if mother has identified him); Ind.Code Ann. § 31–3–1–6.1 (Burns Supp.1996) (providing if mother has identified putative father to adoption agency on or before she gives consent for adoption, named father is entitled to notice of adoption proceedings); Mo.Ann.Stat. §§ 453.030, 453.040 (Vernon 1986 & Supp.1996) (requiring consent if parent's identity is known or ascertainable). Two other states do not require putative fathers to file a claim of paternity if they have instituted a paternity action. Minn.Stat.Ann. § 259.51 (West Supp.1996) (requiring putative father to file claim of paternity within ninety days of child's birth or sixty days of placement for adoption, unless he has instituted paternity action); Ohio Rev.Code Ann. § 3107.06(F) (Page 1996) (allowing putative father to receive notice if at any time before child is relinquished for adoption, he has alleged to be the father in paternity action).

ry hearing to be held so that the child may expeditiously be placed in a stable, permanent home.

LDS Social Services clearly could have avoided the litigation we have before us by simply informing the father that these forms were available through their agency and were necessary for him to assert his rights. Even if mailing the form to the presumably small number of out-of-state fathers timely expressing interest in their children would be too burdensome, a single sentence in the letter sent to the father requesting background information and asking that he waive his parental rights could have informed the father of the statutory requirements in Utah to protect his parental rights. Had the father received this form, he could have mailed it in, received notice of the adoption proceedings, and had the best interests of the child promptly determined at an evidentiary hearing. Instead, the parties involved, and most importantly the child, are enduring years of exhausting litigation and uncertainty.

In my view, the father is entitled to, at least, an evidentiary hearing to determine whether the statute as applied to the facts of this case denied him due process. I would further conclude that, if the facts develop as the father alleges, the application of the adoption statute to terminate his parental rights denied him due process of law. I therefore respectfully dissent.