1999 OK 74

In the Matter of the TERMINATION OF the PARENTAL RIGHTS OF the BIOLOGICAL PARENTS OF BABY BOY W., a minor child.

No. 91,604.

Supreme Court of Oklahoma.

Sept. 16, 1999.

Jack R. Givens, Jones, Givens, Gotcher & Bogan, Tulsa, Oklahoma, for Hannah's Prayer Adoption Agency, Inc.

Benjamin C. Faulkner, Tulsa, Oklahoma, for Natural Father.

Lisa R. Frazier, Assistant Public Defender, Tulsa, Oklahoma, for Minor Child.

Carol S. Nichols, Tulsa, Oklahoma, for Prospective Adoptive Parents.

HODGES, J.

¶ 1   This is an action by an adoption agency to terminate the parental rights of a child's natural father. The child's natural mother placed the child with the agency for adoption, relinquishing her parental rights. The adoption agency then placed the child with prospective adoptive parents.

¶ 2   The issue is whether the natural father was denied the chance to grasp his parental opportunity interest in his child through the actions of the child's natural mother and the adoption agency. This Court holds that he was denied that chance in contravention of due process. Further, there was nothing more required of the natural father, under the circumstances, in regards to an attempt to discover whether he had fathered a child. Thus, his parental rights may not be terminated and his consent is necessary for adoption.

¶ 3   The natural parents of Baby Boy W. met while they were students at Oklahoma State University. In August, 1996, they began an exclusive sexual relationship which continued until they broke up in mid-January, 1997. During this time, Natural Father claims to have discussed his desire to parent a child should Natural Mother became pregnant by him. He also claims to have to told her that treatment for cancer, involving the removal of a testicle and post-operative chemotherapy, had left his chances of producing offspring at "slim to none."

¶ 4   Following the end of their relationship, neither made contact with the other with the exception of a birthday greeting which Natural Father left on Natural Mother's telephone answering machine. This lack of contact did not result from ignorance of each other's whereabouts. Each natural parent knew how to reach the other. Natural Father never inquired whether he had fathered a child and Natural Mother claims to have denied being pregnant, to herself and to her mother, until she was tested on July 21, 1997.

¶ 5   That same day, Natural Mother made contact with Hannah's Prayer Adoption Agency (the Agency) and expressed her desire to place the child for adoption. On July 24th, she met with an Agency employee and stated that Natural Father was someone she had met at a college party and that she did not know his last name.

¶ 6   Baby Boy W. was born on August 17, 1997. Five days later, Natural Mother went before District Judge David Winslow and relinquished her parental rights, placing the child with the Agency. She testified that the natural father was known to her only as "Jody" and that his whereabouts were unknown to her. The child was placed with prospective adoptive parents out of state in compliance with the Interstate Compact on the Placement of children. Baby Boy W. has lived with the couple since that time.

¶ 7 On October 15, 1997, Natural Mother revealed Natural Father's first and last name to the Agency. The Agency filed a Petition for Termination of Parental Rights on October 28, 1997 naming "Jody" as the natural father. Hearing on the petition was set for December 19th. On November 25th, the Agency published notice to "Jody" of the hearing in the Tulsa Daily Commerce and Legal News. It located Natural Father on December 17, 1997, and advised him of the hearing. This was Natural Father's first information that he had fathered a child. The hearing was postponed so that the Agency could serve him, which it did on January 23, 1998, by certified mail. Natural Father filed his objection to the Agency's petition on January 27, 1998. Following a blood test, the parties entered into a stipulation that he is the biological father of the child.

¶ 8 The trial court granted Natural Father's request for visitation. On April 26, 1998, the trial court granted Natural Father's motion for summary judgment holding that his consent was necessary for the adoption process to go forward. The trial court dismissed the Agency's petition to terminate his parental rights.

¶ 9 The trial court reasoned that Natural Mother's statement to the trial court when she relinquished her parental rights, that she only knew the first name of Natural Father, along with the Agency's delay in finding him resulted in a violation of due process. The trial court concluded that this violation deprived Natural Father of a constitutionally protected parental opportunity interest in his child. The child has remained in the custody of the prospective adoptive parents with visitation by Natural Father while the matter has been on appeal.

■ ¶ 10 A natural father's constitutional rights concerning his child born out of wedlock were set out in a line of United States Supreme Court cases culminating in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The *Lehr* court drew a sharp distinction between a constitutionally protected parent-child relationship and a potential or opportunity interest, yet to be developed through the natural father's acceptance of responsibility for the child's future.[1] It held that only "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'coming forward to participate in the rearing of his child' [does] his interest in personal contact with his child acquire substantial protection under the due process clause." *Id.* at 261–262, 103 S.Ct. 2985 (quoting *Caban v. Mohammed*, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)).

■ ¶ 11 The *Lehr* holding was echoed by this Court in *In re Baby Boy D.*, 742 P.2d 1059 (Okla.1985). There, this Court held that "[t]he Constitution protects only parent-child relationships of biological parents who have actually committed themselves to their children and have exercised responsibility for rearing their children." *Id.* at 1067.

¶ 12 This principal is also found in Oklahoma's Adoption Code. *See* Okla. Stat. tit. 10 §§ 7501—1.1 thru 7510—3.1 (Supp.1998). "[T]he Legislature has enacted a series of statutes designed to protect both biological fathers who demonstrate sufficient indicia of responsibility toward their progeny balanced against protection of the best interests of children whose biological parents do not demonstrate such responsibility." *In re Baby Girl M.*, 942 P.2d 235, 244 (Okla.Ct.Civ. App.1997).

¶ 13 This preadoption proceeding to terminate parental rights was brought under section 29.1 of title 10.[2] That section provides that when the mother of a child born out of wedlock relinquishes her parental

---

1. As the United States Supreme Court observed:
   The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.
   *Lehr*, 463 U.S. at 262, 103 S.Ct. 2985(footnote omitted).

2. This action was brought a few days before the provision was revised by the new Adoption Code. The new provision became effective November 1, 1997. *See* Okla. Stat. tit. 10, § 7505–2.1 (Supp. 1997).

rights, the adoption agency [3] is to give notice to the natural father and a hearing is to be held. It further provides that:

At the hearing, the court may, if it is in the best interest of the child:

a. accept a relinquishment or consent to adoption executed by the father or putative father of the child, or b. determine that the consent of the father or putative father to the adoption of the child is not required and may terminate any parental rights which the father or putative father may have, or

c. Terminate the parental rights of the father or putative father, pursuant to the provisions of this section or Section 1130 of this title, or

d. grant custody of the child to the father or putative father, if the court determines the person to be the father of the child.

Okla. Stat. tit. 10 § 29.1(F)(1) (Supp.1996).[4]

¶ 14 The statutory grounds for determining whether a natural father's consent to his child's adoption is necessary provide that consent from the father of a child born out of wedlock is not needed if, at the section 29.1 hearing:

having established paternity, he fails to prove that he has exercised parental rights and duties toward the child unless he

proves that prior to the receipt of notice he had been specifically denied knowledge of the child or denied the opportunity to exercise parental rights and duties toward the child. As used in this subparagraph, specific denial of knowledge of the child or denial of the opportunity to exercise parental rights and duties toward the child shall not include those instances where the father or putative father fails to prove to the satisfaction of the court that he made a sufficient attempt to discover if he had fathered the child or to exercise parental rights and duties toward the child prior to the receipt of notice. . . .

*Id.* at § 60.6(3)(b)(2) (Supp.1996).[5] The Oklahoma Comments to the new Adoption Code explained that section 7505–4.2:

established a defense, formerly found in § 60.6(3) (b)(2), to termination on the ground of nonsupport during pregnancy or after the birth of a child. A father or putative father can avoid adoption without consent or termination of his parental rights if he can prove that he was specifically denied knowledge of the minor or denied the opportunity to exercise his parental rights and abilities. To successfully utilize this defense, however, the father or putative father must prove that he made a sufficient attempt to discover if he had

3. This action was brought by the Agency to which the trial court awarded custody of the child at the time when Natural Mother relinquished her parental rights. The provision for an adoption agency's authority to bring such an action was found at section 29.1(A) of title 10 which requires:

Whenever the mother of a child born out of wedlock who has custody of the child executes a relinquishment for the purpose of adoption pursuant to the provisions of Section 28 of this title, the person or agency to whom such relinquishment is made shall file a petition with the district court of the county in which the relinquishment was executed for the termination of the parental rights of the persons entitled to notice pursuant to subsection B of this section unless such rights have been previously terminated or relinquished.

4. The current provision for a preadoption termination of parental rights states:

At the hearing on the petition to terminate parental rights brought pursuant to this section, the court may, if it is in the best interest of the minor:
. . . .

2. Terminate any parental rights which the putative father may have upon any of the grounds provided in Section 7505–4.2 of this title for declaring consent unnecessary.

Okla. Stat. tit. 10, § 7505–2.1 D (Supp.1998).

5. This provision now appears at section 7505–4.2 of title 10 which states:

In any case where a father or a putative father of a minor born out of wedlock claims that, prior to the receipt of notice of the hearing provided for in Sections 7505–2.1 and 7505–4.1 of this title, he had been specifically denied knowledge of the minor or denied the opportunity to exercise parental rights and duties toward the minor, such father or putative father must prove to the satisfaction of the court that he made sufficient attempt to discover if he had fathered a minor or made sufficient attempt to exercise parental rights and duties toward the minor prior to the receipt of notice.

Okla. Stat. tit. 10, § 7505–4.2(D) (Supp.1998).

fathered a child or to exercise parental rights and duties.

Okla. Stat. tit 10, § 7505–4.2 (Supp.1997). This is the standard by which Natural Father's actions must be measured and that standard has been met.

¶ 15 As the trial court observed, Natural Father did everything he could reasonably have done under the circumstances. His conduct was sufficient considering that Natural Mother failed to provide any information to him concerning her pregnancy. After Natural Mother ended the relationship with Natural Father in January, 1997, she knew how to make contact with him, but she never informed him that he was a father. She compounded her attempt to withhold knowledge of the child at the August 22, 1997, hearing at which she relinquished her parental rights. There, she testified that natural father was just someone she had met at a party and that she did not know his identity or where he could be found. Natural Mother's actions constitute specific denial of knowledge of the child and offer a complete defense to the termination of natural father's parental rights.

¶ 16 The actions of Natural Mother and those of the Agency deprived Natural Father of the chance to grasp his parental opportunity interest. Under the Due Process Clause, Natural Father had a right to notice of the fact that Natural Mother was pregnant and had given birth to his child. The duty to inform him rested initially with Natural Mother and later with the Agency. Both failed to inform him despite the relative ease with which this could have been accomplished. In this regard, the Agency was no less to blame than Natural Mother in denying Natural Father notice of the child's existence.

¶ 17 The records of the agency do not reflect that Natural Mother was advised as to the consequences of deceiving the natural father. Nor do the records reflect any inquiry by the Agency into the facts surrounding her pregnancy. When Natural Mother called the Agency on October 15, 1997, and provided Natural Father's first and last name, no effort was made to find him until December of that year. On December 17, 1997, the Agency called information directory assistance in Stillwater and obtained Natural

Father's telephone number. It was the same number he had at the time he was in the relationship with Natural Mother. The Agency left a message on Natural Father's answering machine. He returned the message promptly and learned for the first time that he had been identified as the father of the child.

¶ 18 The record in this matter offers no explanation for the two-month delay in any attempt to make contact with Natural Father. Even worse than the delay is the fact that although the Agency knew Natural Father's first and last name on October 15, 1997, it filed a petition to terminate his parental rights on October 28, 1997, identifying him only as "Jody (last name unknown)." Simultaneously, it filed an affidavit of publication swearing that it did not know the identity or whereabouts of Natural Father. These actions of the Agency at best demonstrate a lack of due diligence and candor. At worst, they indicate complicity in Natural Mother's denial of Natural Father's right to notice of the distinct possibility that he had fathered a child.

¶ 19 Notice and opportunity lie at the heart of due process. *See Bailey v. Campbell*, 862 P.2d 461, 469 (Okla.1991) ("Due process requires adequate notice, a realistic opportunity to appear and the right to participate in a meaningful manner."). Natural Father was deprived of notice of the pregnancy and the birth of his child and thus the chance to grasp his parental opportunity interest in his child. Under these circumstances, his parental rights cannot be terminated and his consent is necessary for adoption.

**TRIAL COURT AFFIRMED.**

¶ 20 SUMMERS, C.J., HARGRAVE, V.C.J., LAVENDER, SIMMS, KAUGER, and WATT, JJ., concur.

¶ 21 OPALA, J.—concurs in judgment.

OPALA, J., with whom SIMMS, J., joins, concurring in judgment.

¶ 1 I concur in the court's judgment but *not* in its pronouncement. Were I to write separately, I would regard

(a) *standing* to challenge (or cloud) the unwed sire's legal interest in his out-of-wedlock child as well as *(b)* the quantum of putative father's rights to the claimed offspring

as issues governed by *state law* rather than by the *minima* of protection afforded by the constitutional jurisprudence of the United States Supreme Court.[1] See 10 O.S.1991 § 1.2; 10 O.S. Supp.1998 §§ 7505–4.1, 7505–4.3, 7506–1.1.

---

**1.** Norms for ascribing or negating legal paternity—whether through marriage or by extramarital insemination—address one's *personal status* or *individual condition* in society and hence *constitute public law. Callison v. Callison,* 1984 OK 7, 687 P.2d 106, 112 (Opala, J., dissenting in part); *Byers v. Byers,* 1980 OK 149, 618 P.2d 930, 932–933; *Green v. Green* 1957 OK 70, 309 P.2d 276, 278; See Graveson, *Status in the Common Law,* p.115 (University of London, The Athlone Press 1953). When resolving a public-law controversy the reviewing court is free to change the theory pressed by the parties at nisi prius and to decide the dispute upon any applicable theory dispositive of the case. *Russell v. Bd. of County Com'rs.,* 1997 OK 80, 952 P.2d 492, 497.