**Affirm and Opinion Filed August 5, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00919-CV

## IN THE INTEREST OF BABY GIRL S., A CHILD

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 10-1040-W-304th**

### OPINION

Before Justices O'Neill, Francis, and Fillmore
Opinion by Justice Francis

The Texas Paternity Registry provides a mechanism for a man who may have fathered a child to assert his parentage, independent of the mother, and protect his parental rights by filing a notice of intent to claim paternity with the bureau of vital statistics. If an alleged father files the notice before the child is born or no later than thirty-one days after the child's birth, he is entitled to be notified of a proceeding for adoption or the termination of parental rights. *See* TEX. FAM. CODE ANN. § 160.403 (West 2008). If an alleged father fails to register, however, his rights may be terminated without notice if the child is under one year old at the time the petition for termination is filed; the statute imposes no requirement to identify or locate him. *See* TEX. FAM. CODE ANN. § 161.002(b)(3), (c-1).

In this case, the mother, A.S., did not name a father of Baby Girl S. at the time she put the infant up for adoption; instead, she claimed she did not know the father's name. J.C., the

biological father of the child, was unaware of the pregnancy or birth and did not register with the paternity registry. Consequently, thirty-five days after the birth of Baby Girl S., J.C.'s rights as an unknown father were terminated without notice to him. Generations Adoptions, a private adoption agency, was named the infant's managing conservator. J.C. learned of the birth of Baby Girl S. the following month but waited for more than four months to file a bill of review to set aside the trial court's order terminating his rights. By that time, the adoption of Baby Girl S. had been finalized.

J.C., Generations Adoptions, and the adoptive parents all moved for summary judgment on the bill of review. After considering the competing motions, the trial court granted the motions of Generations Adoptions and the adoptive parents, denied J.C.'s motion, and denied the relief sought by his bill of review. On appeal, we consider whether the statute allowing the termination of J.C.'s parental rights without notice violated his constitutional due process rights. Because we conclude J.C.'s constitutional rights were not violated, we affirm the trial court's order denying the bill of review.

The summary judgment evidence shows the following. J.C. and A.S. began dating in November 2008. A.S. had just turned sixteen years old and was a high school student. By January 2009, the relationship had evolved into a sexual one, and the two had unprotected sexual intercourse more than 100 times over the next several months. J.C. knew that having unprotected sex could result in pregnancy, but he would not wear a condom even when asked to by A.S. At some point during their relationship, A.S. missed her menstrual period and J.C. bought a home pregnancy test for her to take. The test, however, was "indeterminate." J.C. broke up with A.S. in July or August. Over the next couple of months, J.C. said the thought that A.S. was pregnant was on his mind a lot, and he "just had a feeling" she might be pregnant

2

because they had never "confirmed she wasn't." So, in the fall, J.C. called A.S. and asked her to take another pregnancy test; A.S. refused. Not long after, A.S. learned she was pregnant but did not try to contact J.C. because she believed he was in jail. According to A.S., she did not want J.C. to know about the pregnancy because he had been "verbally and emotionally" abusive to her during the relationship. When her parents asked the father's name, she said she did not know.

In December 2009, A.S. contacted Generations Adoptions about placing her unborn child for adoption. She gave the agency detailed information about herself and her family's personal and health history. On an intake form, she represented she did not remember the father's name but described his physical appearance and stated he was "probably" her same age, a teenager. She also met with Erin Wheeler, an adoption counselor. A.S. told Wheeler her pregnancy resulted from a "one-night stand" at a party where she was intoxicated and she did not know the father's name. A.S. said she had never met the father before the party and had not talked to him since. After reviewing several profiles, A.S. selected an adoptive family.

On March 5, 2010, Baby Girl S. was born. Two days later, A.S. executed an affidavit of relinquishment, giving up her rights to her newborn daughter. The infant was discharged from the hospital into the possession of the adoptive parents, and one week after the baby's birth, the adoption agency filed a petition to terminate A.S.'s rights relying on the previously executed affidavit. The petition also alleged the baby had no "presumed father" and, as grounds to terminate the biological father, alleged he had not filed a notice of intent to claim paternity. The juvenile court appointed an amicus attorney to assist the court in protecting the infant's best interest. On April 9, the juvenile court judge signed the decree of termination and appointed Generations Adoptions as managing conservator of Baby Girl S. In the decree, the court found (1) no man had registered with the Texas Paternity Registry, (2) a parent-child relationship

3

between Baby Girl S. and the biological father did not exist in law or fact, and (3) termination of the relationship between the biological father and Baby Girl S. was in the best interest of the child. At some point, the adoptive parents initiated a separate adoption proceeding.

In late May 2010, a friend told J.C. he heard A.S. had a baby, it was J.C.'s, and A.S. was living in Hawaii. The next day, J.C. texted A.S., who denied giving birth to a baby. J.C. did not believe her and called her the following day. During that conversation, A.S. admitted she had a baby and J.C. was the father. J.C. asked for her address so he could send money and "be a part of the child's life." But, A.S. told him it "was too late" because she had put the baby up for adoption and his rights had been terminated. A.S. said J.C. was "very angry" and hung up. J.C. testified he believed he contacted a lawyer within a week of learning of the baby.

On July 17, 2010, Generations Adoptions learned of J.C. for the first time during a call with A.S.'s mother, who said J.C. had contacted A.S. "expressing his desire to raise their baby." On September 10, 2010, the adoption of Baby Girl S. was finalized. Five days later, J.C.'s attorney sent a letter to A.S. inquiring about the child and the possible adoption. On September 24, Generations Adoptions responded with a letter that stated A.S. had indicated the child's father was unknown to her, no person had filed a notice of intent to claim paternity, and a decree of termination had been rendered. Further, the letter stated the child had been adopted.

On October 8, more than four months after J.C. first learned of the birth of Baby Girl S., he filed his bill of review naming as respondents Generations Adoptions and A.S.[1] The adoptive parents intervened. Ultimately, competing motions for summary judgment were filed. As he has before this Court, J.C. asserted section 161.002 of the family code—the statute under which his parental rights were terminated without notice—is unconstitutional as applied to him. He argued

---

[1] In his brief, he states he also filed numerous other motions in an attempt to preserve his legal remedies in both the termination proceeding and the adoption proceeding. This appeal concerns only the bill of review attacking the termination order.

4

his case "does not fall within the general class of cases" where the paternity registry operates constitutionally. Specifically, he argued he was not an "unknown" father because he was known to the mother, and the mother concealed the pregnancy from him and then lied to the private adoption agency, preventing him from (1) receiving any notice of the suit adjudicating his parentage and (2) having any opportunity of developing a meaningful relationship with his child before his rights were terminated. He argued that, in such circumstances, due process required he be served with notice of the proceeding terminating his rights. Finally, he asserted the statute was not strictly complied with when his rights were terminated.

Relying primarily on the United States Supreme Court's opinion in *Lehr v. Robertson*, 463 U.S. 248 (1983), Generations Adoptions and the adoptive parents argued J.C.'s rights were adequately protected by the paternal registry. They asserted the registry put the right to receive notice within J.C.'s control, independent of the mother, and while he suspected he may have fathered a child, he failed to take the minimal step of registering. As for his complaint he was denied any opportunity to develop a constitutionally meaningful relationship, they argued J.C. waited for months after learning of the child's birth to take any action and pointed to evidence they say demonstrated J.C., at a minimum, should have known to protect his rights. After considering the evidence, the trial court granted the motions of Generations Adoptions and the adoptive parents, denied J.C.'s motion, and denied the relief sought in his bill of review.[2]

The summary judgment rule provides a method of summarily ending a case that involves only a question of law and no fact issues. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). When, as here, both sides move for summary judgment, and the trial court grants one motion and denies the other, we review the summary

---

[2] The record does not show that any DNA testing has been done; nevertheless, both parties agree that J.C. is the child's biological father.

5

judgment evidence presented by both sides and determine all questions presented. *Comm'rs Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). We review the summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Howard v. INA Cnty. Mut. Ins. Co.*, 933 S.W.2d 212, 216 (Tex. App.—Dallas 1996, writ denied). If we conclude the trial court committed reversible error, we render the judgment the trial court should have rendered. *Id.*

A bill of review is an equitable proceeding brought by a party seeking to set aside a prior judgment that is no longer subject to challenge by motion for new trial or appeal. *Caldwell v. Barnes*, 975 S.W.2d 535, 537 (Tex. 1998). To set aside a judgment by bill of review, a petitioner must ordinarily plead and prove (1) a meritorious defense to the cause of action alleged to support the judgment, (2) that he was prevented from making by the fraud, accident, or wrongful act of his opponent, and (3) unmixed with any fault or negligence of his own. *Id.* If he was not served and was entitled to service, he is relieved from showing a meritorious defense, he is not required to show his opponent's fraud, accident, or wrongful act prevented him from presenting such a defense, and his own want of fault or negligence is established. *Id.* A summary judgment will be granted against the bill of review petitioner if the summary judgment movant can establish the absence of any of the three elements of the bill of review. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 311–12 (Tex. 1984).

J.C. first argues he demonstrated his entitlement to prevail on bill of review because the uncontested summary judgment evidence shows he was not served with notice of the underlying proceeding and therefore he was relieved of establishing the remaining elements of his bill of review claim. In this issue, he does not raise a constitutional complaint; rather, he relies solely

6

on the statute for his relief. Therefore, the question here is whether J.C., as an alleged father, was entitled to notice under the relevant statutory scheme.

Chapter 161 of the family code governs termination of the parent-child relationship. As applicable here, section 161.002 provides, in part, as follows:

> (a) Except as otherwise provided by this section, the procedural and substantive standards for termination of parental rights apply to the termination of the rights of an alleged father.

> (b) The rights of an alleged father may be terminated if:

> * * *

> (3) the child is under one year of age at the time the petition for termination of the parent-child relationship or adoption is filed and he has not registered with the paternity registry under Chapter 160[.]

> * * *

> (c-1) The termination of the rights of an alleged father under Subsection (b)(2) or (3) rendered on or after January 1, 2008, does not require personal service of citation or citation by publication on the alleged father, and there is no requirement to identify or locate an alleged father who has not registered with the paternity registry under Chapter 160.

TEX. FAM. CODE ANN. § 161.002.

Working in conjunction with these provisions is Chapter 160, which includes Subchapter E, the paternity registry. Section 160.404 authorizes the termination, without notice, of the parental rights of an alleged father who did not timely register with the paternity registry and who is not entitled to notice under section 160.402 or 161.002. TEX. FAM. CODE ANN. § 160.404. Section 160.402 concerns men who have registered with the paternity registry, who have commenced paternity proceedings, or who have established a parent-child relationship, none of which applies in this case. *See* TEX. FAM. CODE ANN. § 160.402.

The relevant provision here is section 161.002(b)(3), which allows for termination if the child is under one year of age and the father did not register with the paternity registry. The

7

summary judgment evidence established that Baby Girl S. was born on March 5, 2010; the agency filed its termination petition seven days after her birth; and J.C. did not register with the paternity registry. Consequently, the statutory scheme did not require that he receive notice. J.C. nevertheless argues the paternity registry was never intended to apply to fathers like him who are known but have been prevented from learning of the pregnancy and birth by the mother. We cannot agree.

The language of sections 161.002(b)(3) and (c-1) plainly provides that an alleged father's rights may be terminated without notice and without identifying or locating the alleged father if (1) the child is under the age of one and (2) the alleged father did not register with the paternity registry. Nothing in this provision distinguishes between alleged fathers who are known to the mother and those unknown to the mother.

Moreover, this provision is in contrast to the scheme provided when a child is over one year of age when the petition for termination or adoption is filed and the alleged father has not registered with the paternity registry. *See* TEX. FAM. CODE ANN. § 161.002(b)(2)(A), (B). There, the alleged father's rights may be terminated if, after the petitioner has exercised due diligence, (1) his identity and location are unknown or (2) his identity is known but he cannot be located. These provisions show that had the legislature intended any additional restrictions, it would have included them within the language of the statute. Because we conclude J.C. was not entitled to service of citation under the statute, he likewise was not entitled to bypass the elements of his bill of review claim.

J.C. next argues that even if he is required to establish the elements of a bill of review, the summary judgment evidence demonstrates he met this burden. As his meritorious defense, he argues section 161.002 is unconstitutional as applied to him for three reasons: (1) as a

8

"known" father, he had a constitutional due process right to notice of the termination proceeding; (2) the termination proceeding was instituted and completed before he had time to develop a constitutionally protected meaningful relationship with his child; and (3) the statute itself was not strictly complied with when his rights were terminated.

## I. Right to Notice

When the constitutionality of a statute is challenged, we begin our review with a presumption of validity. *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983). The burden is on the party attacking the statute to establish its unconstitutionality. *Tex. Pub. Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927 (Tex. 1985) (orig. proceeding). A statute is unconstitutional as applied when its application to the litigant deprives him of a constitutional right. *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n.16 (Tex. 1995). A party making an "as applied" challenge is required only to demonstrate that the statute operates unconstitutionally when applied to his particular circumstances. *In re B.S.W.*, 87 S.W.3d 766, 771 (Tex. App.— Texarkana 2002, pet. denied), *overruled on other grounds by In re A.V.*, 113 S.W.3d 355 (Tex. 2003). Finally, courts should decide constitutional issues narrowly based on the precise facts of the case, not on speculative or hypothetical injuries. *In re C.M.D.*, 287 S.W.3d 510, 515 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Here, J.C. complains the statute violates both the due process clause of the United States Constitution and the due course of law guarantee of the Texas Constitution; thus, we consider whether J.C. had a constitutionally protected liberty interest under either that was violated by the statutory procedure used in this case. From the outset, we note that J.C. acknowledges the statutory scheme "is generally valid" and, in most circumstances, operates constitutionally. He

9

argues only that it is unconstitutional when applied to his particular circumstances. We begin with the federal constitutional claim.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; *Lehr v. Robertson*, 463 U.S. 248, 256 (1983). Article 1, Section 19 of the Texas Constitution likewise provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. If life, liberty, or property is at stake, procedural due process requires the State to provide notice of a potential deprivation of the interest and an opportunity to be heard regarding the deprivation. *See Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863). In asserting a due process or due course of law claim, J.C. must establish that his interest is constitutionally protected. *Lehr*, 463 U.S. at 256 (due process); *In re J.W.T.*, 872 S.W.2d 189, 194 (Tex. 1994) (due course of law).

In arguing he has a liberty interest, J.C. relies on the United States Supreme Court's recognition that parents have a constitutional right to "the care, custody and control of" their children, *Troxel v. Granville*, 530 U.S. 57, 65 (2000), and that this interest is a "right far more precious than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953). Similarly, Texas recognizes that "the natural right which exists between parents and their children is one of constitutional dimensions." *J.W.T.*, 872 S.W.2d at 195. However, as J.C. concedes, an unwed father does not automatically have full constitutional paternal rights by virtue of a mere biological relationship. *C.M.D.*, 287 S.W.3d at 516.

J.C. argues the facts of this case "fall squarely" within the facts of this Court's opinion in *In re K.M.S.*, 68 S.W.3d 61 (Tex. App.—Dallas 2001), *pet. denied per curiam*, 91 S.W.3d 331

10

(Tex. 2002), and constitutionally require that he receive actual notice before his parental rights are terminated. In *K.M.S.*, the alleged father engaged in a sexual relationship with the mother while he was on military leave. 68 S.W.3d at 63. After he returned to duty in Japan, the mother learned she was pregnant. She moved in with her boyfriend, who consented to being named as the child's father on the birth certificate. After the baby was born, the mother and the boyfriend separated and agreed the boyfriend would take custody of the child. *Id.*

Eleven months after the baby's birth, the alleged father returned on leave from overseas duty. On his second day back, he learned that the mother had given birth to a child. *Id.* Suspecting he might be the father, he attempted to call the mother, but she would not return his calls. He then contacted the boyfriend's mother and offered to take a paternity test, but she told him to contact her son. *Id.* The alleged father made repeated attempts to contact the boyfriend, but was not able to before he had to return to Japan with the Air Force. *Id.*

A few weeks before the baby turned one year old, the boyfriend filed a petition to establish paternity. The alleged father was not named as a respondent nor was he served with notice of the proceeding. *Id.* The trial court signed an "agreed order" stating that both the mother and the boyfriend agreed to the terms of the order, which, among other things, adjudicated the boyfriend as the child's father.

Ultimately, the alleged father filed a bill of review, naming both the mother and the boyfriend as respondents and asserting both committed fraud by obtaining the agreed order without notifying him. *Id.* at 65. The alleged father sought to set aside the order and to obtain paternity testing. The trial court denied testing and the bill of review. The alleged father appealed, arguing the boyfriend's failure to serve him with notice of the petition to establish paternity denied him due process under the Fourteenth Amendment. *Id.* at 67.

11

On appeal, the boyfriend argued there was no evidence the alleged father should have been given notice. We rejected that argument, recounting evidence that the boyfriend had notice of the alleged father's claim. Based on evidence the boyfriend knew of the alleged father, we stated that section 102.009(a)(8) of the family code required that he be served. *Id.* at 68.

J.C. contends that, like the boyfriend in *K.M.S.,* A.S. knew he was the father before the adoption agency filed the termination petition and so, like the boyfriend, he was entitled to service of citation. However, *K.M.S.* did not involve an adoption and/or termination proceeding filed under section 161.002; rather, *K.M.S.* involved a paternity action and turned on whether an alleged father whose identity was *known to the petitioner*, was entitled to service under section 102.009(a)(8). Section 102.009(a)(8) sets out the persons entitled to service of citation on the filing of a petition in an original suit, and includes "an alleged father . . . unless the petitioner has complied with the provisions of Section 161.002(b)(2)(3), or (4)[.]" TEX. FAM. CODE ANN. § 102.009(a)(8). Here, the adoption agency (who, we note, was unaware of J.C.) filed the termination suit when the child was less than one year of age, and J.C. had failed to register with the paternity registry. *See* TEX. FAM. CODE ANN. § 161.002(b)(3). Consequently, J.C. was not entitled to service under section 102.009(a)(8). We therefore conclude the holding in *K.M.S.* does not apply to the facts of this case.

The facts here are more similar to *Lehr*, the United States Supreme Court's leading case analyzing putative father registries in the context of adoptions. In *Lehr*, the child was born to unmarried parents. The couple never lived together after the birth of the child, and Lehr rarely saw the child and never supported her. *Lehr,* 463 U.S. at 252, 249. The mother married another man who, when the child was two, filed a petition to adopt her. *Id*. at 250. After the court

entered an order of adoption, Lehr challenged the order as violating his due process and equal protection rights because he was not given notice of the adoption proceeding. *Id*.

The State of New York maintained a putative father registry that provided a man was entitled to notice of an adoption proceeding if he filed with the registry. *Id*. Lehr did not register. After reviewing the facts in previous cases addressing the rights of unmarried biological fathers, the court noted the "clear and significant" difference between the developed parent-child relationship that was implicated in earlier cases, and the "potential relationship" involved in *Lehr*. *Id*. at 261. "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protections under the due process clause." *Id*. (quoting *Caban v. Mohammed*, 441 U.S. 380, 389, 392 n.7. (1979)). But, the "mere existence of a biological link does not merit constitutional protection." *Id*. The biological connection instead offers the natural father the opportunity to develop a relationship with his child. *Id*. at 262. "If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie." *Id*. The Court specifically noted it was not considering the constitutional adequacy of New York's procedures for "terminating a developed relationship." Rather, Lehr had never had "any significant custodial, personal, or financial relationship" with his child, and had not sought to establish a legal tie until she was two years old.[3] Thus, the Court was concerned only with whether New York had adequately protected his opportunity to form such a relationship.

---

[3] In reaching this conclusion, the Court essentially ignored Lehr's efforts to establish a relationship with the child as well as the mother's efforts to thwart the development of that relationship. *See Lehr*, 463 U.S. at 271 (White, J., dissenting) (noting Lehr's "version of the 'facts' paints a far different picture than that portrayed by the majority").

The Court then considered the New York statutory scheme, which "automatically provide[d] notice to seven categories of putative fathers who are likely to have assumed some responsibility for the care of their natural children." *Id*. at 263. If the scheme likely omitted many responsible fathers and if qualification for notice were beyond the interested putative father's control, the Court said it may be "procedurally inadequate." *Id*. at 264. But, as is the case under the Texas statute, the right to receive notice under the New York law "was completely within [Lehr's] control." *Id*. By mailing a postcard to the putative father registry, the Court said Lehr could have guaranteed he would receive notice of any proceedings to adopt his child. And, the fact he may not have registered because of "his ignorance of the law" was not "sufficient reason for criticizing the law itself." *Id*. The Court concluded the New York statutory scheme adequately protected Lehr's "inchoate interest" in establishing a relationship with his biological daughter. *Id*. at 265.

Like the Court in *Lehr*, we are not being asked whether our statutory scheme adequately protected the rights of an alleged father who had a fully developed relationship with his child. Rather, we are being asked to consider whether the safeguards provided in the paternity registry were adequate to protect J.C., who was unaware of the pregnancy or birth and whose only link to his child is biological. We begin with the statute.

As stated previously, the rights of an alleged father may be terminated if the child is under one year of age when the petition for termination or adoption is filed and he has not registered with the paternity registry under Chapter 160. TEX. FAM. CODE ANN. § 161.002(b)(3). In this instance, the alleged father does not have to be served personally or by publication nor is there any requirement to identify or locate him if he has not registered. TEX. FAM. CODE ANN. § 161.002(c-1).

Under the family code, "'[a]lleged father' means a man who alleges himself to be, or is alleged to be, the genetic father or a possible genetic father of a child, but whose paternity has not been determined." TEX. FAM. CODE ANN. § 101.0015(a) (West 2008). The term alleged father does not include a presumed father. *Id.* at § 101.0015(b)(1).

Here, as in *Lehr*, Texas has a paternity registry that allows an alleged father to register if he "desires to be notified of a proceeding for the adoption of or the termination of parental rights regarding a child that he *may have* fathered." TEX. FAM. CODE ANN. § 160.402(a) (emphasis added). Any man who believes he may have fathered a child may register with the paternity registry before the child is born or not later than thirty-one days after the child's birth. TEX. FAM. CODE ANN. § 160.402(a)(1),(2). Moreover, any man is entitled to notice of an adoption or termination proceeding, regardless of whether he has registered, if (1) a father-child relationship has been established under chapter 160 or any other law or (2) the man commences a proceeding to adjudicate his paternity before the court has terminated his rights. TEX. FAM. CODE ANN. § 160.402(b).

The paternity registry statute sets out the information to be contained in the form to be used to register; classifies the information as confidential; provides for a penalty for the intentional release of such information; allows for the rescission of registration; prohibits any fees for registering; and requires the petitioner for adoption or termination of paternal rights to obtain a certificate of the results of the search of the registry. *See* TEX. FAM. CODE ANN. §§ 160.411-16, .421. Further, the statute requires a registrant to promptly notify the registry of a change in the information provided, and the bureau of vital statistics is required to incorporate the new information into its records. *Id.* § 160.402(c). The bureau is not, however, required to affirmatively seek to obtain current information. *Id.* If a man timely registers, he is entitled to

15

notice of any proceeding for adoption of the child or termination of his rights, and notice must be given in a manner prescribed for service of process in a civil action. *Id.* § 161.403. And, most importantly, whether to register is within the complete control of the alleged father.

In short, the registry provides an alleged father with the means of asserting his rights without depending on the mother, the courts, or anyone else to identify him. By registering, an alleged father ensures he will be notified of any proceeding to adopt the child or to terminate his rights. It also provides a measure of privacy for the mother who, for any number of reasons, may not want to divulge the biological father's name. Finally, it reduces any delays in an adoption proceeding because an unknown father is either registered or he is not. If he is, he gets notice.

In this case, to be entitled to notice, J.C. needed only to fill out a pre-printed form and file it with the bureau of vital statistics before Baby Girl S. was born or within thirty-one days of her birth. That he may not have known of the registry does not relieve him of the requirement to follow the law. *See Lehr,* 463 U.S. at 264. The information he provided would have been confidential, and there was no financial cost to him nor was there any penalty in the event A.S. was not pregnant. Finally, as in *Lehr*, whether to register was within J.C.'s complete control; A.S. had no say in the registration process.

J.C., however, complains this procedure failed to adequately protect his rights because he did not know about the pregnancy or birth. The common thread throughout his argument is that he was at the complete mercy of A.S. because she knew about him and concealed the birth and pregnancy from him, leaving him with no reason to register. But the undisputed facts in this case demonstrate J.C. did have reason to believe A.S. could be pregnant. A.S. and J.C. engaged in unprotected sex more than 100 times over a period of several months, and J.C. said he knew having unprotected sex could lead to pregnancy. In fact, before the couple broke up, A.S. missed

16

her menstrual period, and a pregnancy test was "indeterminate." After they broke up, J.C. said he "had a feeling" A.S. was pregnant and called her to ask her to take another test. A.S. refused. Despite having this information, J.C. failed to take any steps to register his intent to claim paternity to the child he *may have fathered* with A.S. As in *Lehr*, the critical circumstance regarding the issue of notice exists in this case: the statute put the ability to register in J.C.'s control and, had he done so, he would have received notice.

In sum, we have not been presented with a statutory scheme that permits the child's mother to control whether a putative father's parental rights will be terminated. Rather, our statutory scheme, at least in the context of the facts presented in this case, permits an alleged father to protect himself by invoking statutory procedures to ensure he received notice. J.C. failed to do so, and that failure does not now render the statutory procedure unconstitutional.

## II. Right to Develop Protected Relationship

J.C. next argues his constitutional rights were violated because the termination proceeding was instituted and completed before he had time to develop a "constitutionally protected meaningful relationship with his child." He argues the facts here are materially different from *Lehr*, where the biological father had two years to form a relationship with his child, because his rights were terminated without notice to him before he ever knew about the pregnancy or the birth. He argues that when a father is denied such an opportunity, it is "unfair to categorically analyze him along with fathers who squander their opportunities." Further, he argues that to "grasp the opportunity," he must first "have had knowledge of such an opportunity and must not have been prevented from embracing that opportunity."

*Lehr* did not address the particular situation before us, nor has the Supreme Court taken up the specific issue of an unmarried father's rights to his newborn child. But, in a case with

17

facts remarkably similar to ours, the Kansas Supreme Court did consider the validity of a newborn adoption where the biological father claimed the mother's lies about the pregnancy and birth had prevented him from forming a meaningful relationship with the child. *See In re Adoption of A.A.T.*, 196 P.3d 1180 (Kan. 2008). Specifically, the court considered whether the biological father had a constitutionally protected liberty interest under the due process clause of the Fourteenth Amendment, such that he was entitled to notice of the adoption proceeding. *Id*. at 1189. The court reasoned that a liberty interest resulting in a right to notice is created by a "developed familial relationship," not biology. *Id*. at 1185. Although the father may be blameless, his belated attempt to assert a parental interest six months after the adoption was final could not "overcome the fully matured interests of the State and the adoptive family in the permanency and stability of the adoption." *Id*.

In *A.A.T.*, the couple became sexually involved, and the woman got pregnant. She left New York to visit Kansas and decided to stay there. *Id*. She refused to give the father her address, but they talked on the telephone. After she moved, she falsely told him she had an abortion and later said she did so because she knew he would not consent to an adoption. The couple continued to talk throughout the mother's pregnancy and after. *Id*. During this time, the father expressed doubts about whether the mother was being truthful about the abortion. In addition to the father, the mother also deceived her mother, other family members, and friends, telling them the baby died at delivery. She told the adoption agency that she did not know the father's last name and had only "vague information" about where he lived. *Id*.

The day after the baby's birth, the mother directed that A.A.T. be given to the adoptive parents, who took the baby home from the hospital. The adoptive parents filed their petition for adoption and for termination of the father's parental rights one week after the baby's birth. In an

18

affidavit, the mother gave a false surname for the child's putative father and falsely said the father was not willing to be of assistance to her during the pregnancy and that she had no personal knowledge of his background information. *Id.* The mother also provided incorrect information to a guardian ad litem appointed to represent the father. *Id.* A notice containing the inaccurate name of the putative father was published in the *New York Post*; the notice also contained A.A.T.'s last name and stated that Kansas was the place of the proceeding.

No father appeared before the court, and the natural father's parental rights were terminated and the adoption decree finalized. *Id*. at 1186. When A.A.T. was six months old, the mother told the father the truth. Within six weeks, the father had retained counsel and begun an action to set aside the adoption. *Id*.

In considering whether the alleged father had such an interest, the court emphasized the importance of an actual parenting relationship over a mere biological relationship. Moreover, the court surveyed and analyzed federal and state law regarding the rights of unwed fathers, paying particular attention to cases involving newborn adoptions. *Id*. at 1190–94. Ultimately, the court found that states have generally recognized an unmarried biological father has a liberty interest entitling him to notice of adoption proceedings involving his newborn child if he (1) diligently took affirmative action that manifested a full commitment to parenting responsibilities and (2) did so during the pregnancy and within a short time after he discovered or reasonably should have discovered the mother was pregnant with his child. *Id.* at 1194.

The first factor, whether a father has taken diligent, affirmative action, measures the father's efforts to financially support the child, legally substantiate his relationship with the child, and to provide emotional, financial, and other support to the mother during the pregnancy. *Id*. Under this factor, courts have required the father to use legal mechanisms within his control

that would entitle him to notice—such as a paternity registry—regardless of whether the father was aware of the child's existence. *Id*.

The second factor is considered the most critical and considers the "timeliness or promptness" of the father's action and whether he showed a commitment to the child "within a short time after he discovered or reasonably should have discovered that the mother was pregnant with his child." *Id*. The need for promptness "reflects the reality of the newborn adoption situation, which provides the father with only a limited time to act" and acknowledges the state's interest "in being able to determine as early as possible in a child's life the rights, interests, and obligations of all parties, in eliminating the risk of unnecessary controversy that might impair the finality of an adoption, in encouraging adoptions, in protecting the adoption process from unnecessary controversy and complication, and in protecting the privacy and liberty interests of the natural mother and all parties to the adoption." *Id*. at 1194-95.

After applying these factors to the facts before it, the court concluded the biological father had not diligently taken affirmative action "that manifested a full commitment to parenting responsibilities during the pregnancy and within a short time after he discovered [the mother] was pregnant with his child." *Id*. at 1195. The court specifically noted that the father had offered no explanation for his failure to act during the time between learning of the pregnancy and the mother's lie about the abortion, nor later did he attempt to locate the mother, confirm the pregnancy, substantiate his legal rights, or take any action even though the trial court found he should have known and did suspect the mother was "still pregnant with his child and she gave birth to his child." *Id*. at 1195–96.

The court rejected the father's arguments he was precluded by the mother's "fraud," explaining the cases generally do not focus upon the natural mother's intent; rather, the analysis

focuses upon whether "the State is justified in ending the putative father's opportunity to develop a relationship and in recognizing the finality of the adoption" even if the biological father is thwarted by the mother. *Id*. at 1196. As long as the state's statute provides a process whereby most responsible putative fathers can qualify for notice, courts generally conclude a mother's actions alone will not excuse the father's failure to establish a relationship with his child. *See id*. at 1196–99.

The court then compared the Kansas statutes to the New York provisions considered in *Lehr*, concluding the statute was "likely to cover responsible fathers who have stepped forward to assume parenting responsibilities." *Id*. at 1200. Additionally, the father in *A.A.T.* could have availed himself of the legal protections of New York, which was the state of his domicile and the location of the child's conception, among other things, yet he did not. The court ultimately concluded the father did not have a liberty interest in a relationship with A.A.T. and the State did not deny him the opportunity to establish such a relationship. *Id*. at 1203.

Applying these factors to the facts in our case, we conclude J.C. did not take diligent affirmative action that manifested a full commitment to parenting responsibilities within a short time after he discovered or reasonably should have discovered A.S. was pregnant with his child. Although he had legal mechanisms within his control—the paternity registry—that would have entitled him to notice of the termination proceeding, he failed to register. Under the paternity registry, J.C. need have done nothing more than fill out a pre-printed form and file it with the bureau of vital statistics. *See* TEX. FAM. CODE ANN. § 160.411. Timely registration entitled him, as an alleged father, to notice of any proceeding for the adoption of or termination of parental rights regarding any child he may have fathered. *Id*. § 160.402.

21

The fact that J.C. did not know of the child's existence does not alter our analysis. As stated previously, the undisputed evidence showed that J.C. had unprotected sex with A.S. more than 100 times over a period of seven to eight months. Further, J.C. was aware that having unprotected sex could lead to pregnancy. In fact, A.S. missed her menstrual period, and J.C. bought a home pregnancy test for her to take. The results, however, were "indeterminate." The couple then broke up, and after a couple of months, J.C. contacted her because he "had a feeling" she might be pregnant, but she refused to take another pregnancy test. Nevertheless, he made no further attempts to see her or contact her or to protect his potential rights by filing with the paternity registry. Then, when he learned in late May that A.S. gave birth to Baby Girl S., he waited for more than four months before filing any legal action. As one court so aptly expressed:

> To conclude the petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability.

*Matter of Robert O. v. Russell K.*, 604 N.E.2d 99, 103–04 (N.Y. 1992).

We conclude the statute adequately protected J.C., given the information available to him and his failure to register and to act promptly either during A.S.'s pregnancy or once he learned she had given birth to a child he fathered. We therefore conclude section 161.002 is not unconstitutional as applied to J.C. because it did not operate to prevent J.C. from developing a meaningful relationship with Baby Girl S. prior to the termination of his rights.

In reaching this conclusion, we have considered the two out-of-state cases argued by J.C., *In re Baby Boy W.*, 988 P.2d 1270 (Okla. 1999), and *In re Adoption of Baby Boy Doe*, 717 P.2d 686 (Utah 1986), and do not find them persuasive.

22

In *Baby Boy W.*, the Oklahoma Supreme Court considered whether the biological father was denied his chance to grasp his parental opportunity interest in his child due to the actions of the mother and the adoption agency. 988 P.2d at 1271. There, the mother learned she was pregnant after she and the biological father broke up. She relinquished her rights and placed the infant with an adoption agency. She testified the biological father was known to her only as "Jody" and that she did not know his location. *Id*. The infant was placed with prospective adoptive parents. *Id*.

Two months after the child's birth, the mother told the adoption agency father's first and last name. *Id*. at 1272. Nevertheless, the agency filed a petition for termination of his rights naming "Jody" as the biological father and published notice under that name in the newspaper. Two months later, the agency located the biological father. The father's biological paternity was confirmed, and the trial court ultimately denied the agency's petition to terminate his rights. The adoption agency appealed. *Id*.

On appeal, the Oklahoma Supreme Court explained that the statutory scheme for terminating an alleged father's rights required the adoption agency to give notice and to set a termination hearing at which the trial court could, among other things, accept the alleged father's consent to the adoption or determine whether the alleged father's consent was necessary. *Id*. at 1273. Oklahoma's statutory scheme provided that the father's consent was not necessary if at the hearing the father fails to prove he exercised his parental rights and duties toward the child "unless he proves that prior to the receipt of notice he has been specifically denied knowledge of the child or denied the opportunity to exercise the parental rights and duties toward the child." *Id.* The exception does not include "those instances where the father or putative father fails to prove to the satisfaction of the court that he made a sufficient attempt to discover if he had

23

fathered a child or to exercise paternal rights and duties toward the child prior to receipt of notice." *Id*.

The court considered the father's constitutional claim within the context of that statute and concluded the actions of the mother and the adoption agency deprived the biological father of the chance to grasp his parental opportunity interest. *Id*. at 1274. The court concluded that, under the due process clause, the father was entitled to notice of the fact the mother was pregnant and had given birth to his child. *Id*.

Here, both our statutory scheme and the facts of the case are different. The Oklahoma statute provided a defense that excused the father from failing to exercise his parental rights and duties toward a child. The father in *Baby Boy W.* apparently satisfied the defense. Our statute provides for no such defense but provides any man who believes he may have fathered a child with a mechanism to ensure he receives notice. As stated previously, J.C. was aware that A.S. could be pregnant both before and after he ended the relationship. Nevertheless, he failed to protect any right by registering with the paternity registry.

J.C. also relies on *Baby Boy Doe*, where the mother intentionally lied to the putative father, telling him they would marry and raise the child together, while her real intention was to place the child for adoption immediately after birth. 717 P.2d at 687, 690. The putative father relied on the mother's statements and did not protect his rights. *Id*. at 690. While the father was in another state looking for a place for them to live, the mother delivered the baby early and put it up for adoption without telling the father. *Id*. at 687. The father learned his child had been born three days after the birth, immediately contacted a lawyer, and filed a notice of claim to paternity the following day. Nine days after learning that the mother put the child up for adoption, the father filed a motion to set aside the termination of his rights. *Id*. at 688. Utah's

24

statutory scheme allowed an unwed father's parental rights to be terminated if he failed to file a notice of paternity before a petition for adoption was filed. *Id*. at 688.

The Utah Supreme Court ultimately concluded the birth mother's intentional misrepresentation, coupled with the fact that the father made clear his intention to rear his child, relieved the father of the obligation of registering because "termination of his parental rights was contrary to basic notions of due process, and . . . he came forward within a reasonable time after the baby's birth." *Id*. at 691.

Again, the facts of this case and our statutory scheme are materially different from that in *Baby Boy Doe*. A.S. did not flee to another state and give birth to her child. After she and J.C. broke up, she remained in Texas. (A.S. moved to Hawaii after giving birth.) Also, there is no evidence that A.S. ever promised to marry J.C. or that the two ever discussed what would happen if she were to become pregnant. Although J.C. alleges A.S. lied about her pregnancy, the record shows that when J.C. called her in the fall and asked her to take a pregnancy test, she did not know she was pregnant. Moreover, unlike the father in *Baby Boy Doe*, who immediately took action to protect his rights, J.C. waited four months to file a bill of review.

In his brief, J.C. also suggests the statute violated the due course of law provision of article 1, section 19 of the Texas Constitution. Relying on the Texas Supreme Court's opinion in *In re J.W.T.*, 872 S.W.2d 189 (Tex. 1994), he argues our state constitutional provision provides more expansive protections than its federal counterpart.

In *J.W.T.*, the Texas Supreme Court considered whether, under our due course of law guarantee, a biological father could be denied standing to establish his paternity and claim parental rights. 872 S.W.2d at 189. The facts were that Larry and Judy conceived a child while living together, although Judy was married at the time to Randy. Judy planned to marry Larry

after her divorce. During her pregnancy, Larry and Judy together arranged for prenatal care at a local clinic, Larry acknowledged his paternity in a contract with the clinic, and Larry made several payments for obstetric treatment. *Id.*

Judy and Randy reconciled and dropped the divorce action. *Id.* Before the child was born, Larry brought an action under the family code alleging he was J.W.T.'s father, acknowledging responsibility for child support, and seeking a judicial declaration of paternity and recognition of visitation rights. *Id.* After the child's birth, Larry tried to maintain contact with the child. Both Judy and Randy opposed the paternity action. A court-ordered paternity test showed a 99.41 percent probability that Larry was J.W.T.'s biological father. *Id.* at 190.

The trial court dismissed the case because Larry did not meet any of the statutory criteria that defined who could bring an original suit affecting the parent-child relationship. *Gibson v. J.W.T.*, 815 S.W.2d 864, 865 (Tex. App.—Beaumont 1991), *aff'd sub nom. In re J.W.T.*, 872 S.W.2d 189 (Tex. 1994). In particular, Larry's suit was barred because the mother's husband was presumed to be J.W.T.'s father. *J.W.T.*, 872 S.W.2d at 190.

On appeal, Larry argued the dismissal of his paternity action violated his constitutional rights. The Beaumont Court of Appeals agreed, reversing the case after determining the statute violated the due course of law provision in article I, section 19 of the Texas Constitution. The Texas Supreme Court affirmed the decision, concluding that where the biological father asserts his interest near the time of the child's birth, standing is constitutionally mandated under the Texas Constitution if he both (1) acknowledges responsibility for child support or other care and maintenance, and (2) "makes serious and continuous efforts to establish a relationship with the child." *Id.* at 195. The court affirmatively rejected the plurality opinion in *Michael H. v. Gerald*

26

*D.*, 491 U.S. 110 (1989), which addressed a similar fact pattern, and characterized it as an "aberration" from previous federal case law. *Id.* at 196.

In reaching its conclusion, the court stated: "We do not say that our Constitution guarantees every natural father ties with his illegitimate offspring. We do say that one who is arbitrarily prevented from attempting to establish any relationship with his natural child, after making early and unqualified acceptance of parental duties as Larry has done, is denied due course of law under section 19 of our Texas Bill of Rights." *Id*. at 198.

The facts of *J.W.T.* are distinguishable. In *J.W.T.*, the court was considering a statute that created an automatic, unbreakable barrier to the father's ability to establish a relationship with his child. Here, in contrast, the family code creates a mechanism—the Texas Paternity Registry—that gives J.C. the ability to attempt to establish a relationship by simply filing a notice of intent to claim paternity. The registry puts control in the hands of alleged fathers, like J.C., independent of the mother. We conclude that under the particular facts of this case, the Texas due course of law provision does not, in this instance, provide any greater protection to J.C. As the Texas Supreme Court most recently pronounced: "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re E.C.R.*, No. 12-0744, 2013 WL 2660130, at *1 (Tex. June 14, 2013).

We are aware of the delicate balance the legislature attempted to achieve by enacting a statutory scheme that would give alleged fathers the ability to control their own destinies with respect to their child and, at the same time, protect a mother's privacy rights and assure the State's strong interest in providing a child with a stable home. It is not for this Court to decide

whether another scheme would be more palatable; we only decide in this case whether a particular alleged father was denied due process. We decide he was not.

### III. Failure to Comply with Statute

Finally, as an additional meritorious defense, J.C. argues his constitutional rights have been violated because the trial court failed to strictly comply with the statute for two reasons. First, he directs us to section 161.002(e), which provides the court "shall not render an order terminating parental rights under Subsection (b)(2) or (3) unless the court receives evidence of a certificate of the results of a search of the paternity registry under Chapter 160 from the bureau of vital statistics indicating no man has registered the intent to claim paternity." TEX. FAM. CODE ANN. § 161.002(e). He contends the decree "does not state that the court received in evidence such a certificate, nor does it state that the court based its decision regarding termination on the certificate."

The record contains the decree of termination. In the decree, the court found "that no man has registered with the Texas Paternity Registry pursuant to Chapter 160, Subchapter D of the Texas Family Code." Furthermore, our record contains a Certificate of Paternity Registry Search, dated April 7, 2010 (the thirty-second day after the child's birth) and signed by the state registrar, certifying that a diligent search of the paternity registry had been made and no notice had been located. Given the record before us, we conclude the decree satisfies the statute.

Second, J.C. complains the trial court failed to strictly comply with section 161.002 because the adoption agency filed its termination petition seven days after Baby Girl S. was born, and section 160.402(a) allows him thirty-one days after the child is born to register. As previously discussed, section 161.002(b)(3), in conjunction with section 160.402(a), allowed J.C.'s rights to be terminated if he failed to register with the paternity registry. But nothing in

28

either statute suggests the adoption agency must wait until thirty-one days to file a termination petition. Had J.C. timely registered, he would have been entitled to notice regardless of when the adoption agency filed its petition. This issue is without merit.

We conclude Generations Adoptions and the adoptive parents established as a matter of law that J.C. did not have a meritorious defense and thus was not entitled to a bill of review. Consequently, the trial court did not err by granting summary judgment in favor of appellees nor did it err in denying J.C.'s opposing motion for summary judgment. We overrule J.C.'s issues.

We affirm the trial court's judgment.

120919F.P05

/Molly Francis/
MOLLY FRANCIS
JUSTICE